THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MANUEL BOBE, Defendant-Appellant.

First District (6th Division)   No. 1—89—0878

Opinion filed March 27, 1992.—Rehearing denied April 22, 1992.

Michael J. Pelletier and Linda Eigner, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Howard D. Weisman, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE EGAN delivered the opinion of the court:

A jury convicted the defendant, Manuel Bobe, of the murder of three persons under the accountability statute. (Ill. Rev. Stat. 1985, ch. 38, par. 5—2.) He was sentenced to three concurrent terms of natural life imprisonment. He first argues that the State's proof failed to identify him as a participant in the murders beyond a reasonable doubt; alternatively, he maintains that numerous errors denied him a fair trial. He does not argue that the evidence was insufficient to establish guilt on the basis of accountability.

On the night of November 7, 1986, a group of teenagers were gathered for a party in the basement at 6318 South Washtenaw in Chicago. Shortly after midnight, there was a knock at the basement door. When the door was opened, an intruder looked around the door, fired several shots into the party, and retreated. The shots struck four teenagers, killing three of them.

Holly McGuire testified that there were about 30 people at the party, drinking, talking and listening to music provided by a DJ. Around 12:30 a.m., there was a knock at the back door. Jessie Villagomez started to open the door, and the door was pushed open and then partially closed. She saw Jason Gray in the doorway with a gun in his hand. She had known him from school for two years and knew he was a member of the Two-Six gang. She also saw shadows of two or three other people in the doorway, but she could not see who they were. Gray fired and shot Michael Villasenor, who fell to the floor. She became frightened and lay on the floor. About six or seven shots were fired. When the shots ended, she got up and saw four bodies on the floor. Michael Villasenor, Joseph Torres and Mario Martinez were killed; Jose Mendez was wounded.

Jessie Alvarez testified that he was a member of a gang, the Two-Two Boys, enemies of the Two-Sixers. He saw four Mexican boys and a blond white boy in the doorway. He knew that three of the Mexican boys were No-Neck Rabbit, Inky and Stony; he did not know their real names. The fourth Mexican boy was the defendant, whom Alvarez knew from Kelly High School. He knew him by a nickname, "Little Hulk." Both the white boy and the defendant were holding guns. The white boy then fired his gun into the crowded party. After the gun was fired, Michael Villasenor fell backwards onto Alvarez, knocking him to the floor. He heard six shots. After the shooting stopped, Alvarez ran outside. He saw five people running down the alley; one was the defendant, who turned and shot at him. The five boys got into a green Cadillac Eldorado and left. A brown car, parked

behind the green one, followed. The occupants of the brown car were giving Two-Six hand signals. Alvarez viewed a lineup the following day and identified the defendant as one of the persons he saw in the basement doorway holding a gun. He identified Jason Gray as the person who fired into the crowd.

Alvarez also described encounters he had had with the defendant and others earlier that evening. Alvarez first went to a party at 63rd and Rockwell with six of his friends, two of whom later became victims of the shooting. As they were leaving the party they met a friend who told them that there was another party nearby at 63rd and Washtenaw. After spending about an hour at the party on Washtenaw, Alvarez left with Sam Rahder to pick up some more friends in Cicero. On their way to Cicero, they stopped at a 7-11 store to buy cigarettes. When they pulled into the parking lot, they saw a blond white boy and a Mexican boy beating up two other boys. Rahder and Alvarez got out of their car, and the blond boy and the Mexican boy got into a green Eldorado. As the Eldorado pulled out of the lot, Alvarez saw that the defendant was driving.

As Alvarez and Rahder continued down Kedzie to get to the expressway, the same green Eldorado pulled alongside them. The occupants were throwing bottles at Rahder's car and displaying Two-Six hand signals. Alvarez and Rahder responded with Two-Two hand signals and then pulled onto the expressway.

After picking up their friends in Cicero, Alvarez and Rahder headed back toward the party at 63rd and Washtenaw. When they got off the expressway at California Avenue, the Eldorado pulled up alongside them again. The same three boys were in the car, but the Mexican boy was now driving. The Eldorado pulled ahead of Alvarez and Rahder and then stopped. The white boy and the defendant got out of the car, displaying hand signals and saying, "Come on." Alvarez and two boys from Cicero jumped out of their car; the blond boy and the defendant jumped back in the Eldorado and drove to the next block where they blocked the intersection with their car. As Rahder's car approached, the Eldorado drove away. Rahder and Alvarez then proceeded back toward the party.

Alvarez was interviewed by Detective Leroy Almanza several hours after the shootings. Almanza testified that Alvarez said he had seen "four dudes" in the doorway at the party: Stony, Inky, Rabbit and Hawk. Alvarez said that he did not know their real names. Alvarez did not tell Almanza that he knew the defendant from Kelly High School or that he had seen a blond white boy in the doorway. Alvarez did not mention his earlier encounters with the defendant

that evening. However, Alvarez did tell him that the shooters left in a green Eldorado and a brown car, which he thought might have been an Oldsmobile.

Rahder, who was 17 years old at the time of the shooting, corroborated Alvarez's testimony about the encounters with the green Eldorado before the shootings. He identified the white boy as Jason Gray and the defendant as the driver of the green Eldorado. After the trial, he recanted his testimony. He said that he had not seen the defendant or a green Eldorado at the 7-11 and that, during the encounter near the expressway, he had seen a third person but could not identify him. He said that he testified as he did at the trial because the assistant State's Attorney told him to and because the prosecution had convinced him that the defendant had "done it."

Sylvia Onoroto testified that her mother dropped her off at the party on Washtenaw around 7:15 or 7:30 p.m. She looked out the front window to see if her mother was still out there. While Sylvia was watching her mother, she noticed an old green Eldorado driving around very slowly. She could not see inside the car. The car circled the block four times, slowing each time it passed in front of the house. When she noticed that her mother was gone, Sylvia went down into the basement. People were drinking, talking and dancing to music provided by a DJ.

Around 8 or 8:30 p.m., two girls came into the party. Both girls were wearing identical jackets of beige and black, Two-Six colors. The girls walked around the party without talking to anyone and were escorted out. Shortly after the two girls left, Sylvia heard a knock at the door. She was standing next to the DJ, and she heard gunshots. The DJ threw her on the floor and told her not to get up. About 5 or 10 minutes later, Sylvia got up and went upstairs.

The defendant was arrested by Officer John Bloore and taken to Area 3 Violent Crimes Headquarters at 39th and California Avenue. Bloore testified that he did not question the defendant about the shootings, but he gave the defendant *Miranda* warnings.

Officer Michael Kill was a member of the Area 3 Violent Crimes Unit. Around midnight of the day after the shooting, Kill, who was not assigned to this investigation, saw the defendant sitting in one of the interview rooms of the police station. The defendant asked Kill if he was in trouble, and Kill said he did not know. The defendant then asked if he could talk to Kill, who said, "Sure, go ahead." The defendant said that he was outside the party but did not do the shooting; Jason Gray did the shooting and did it with a nine-millimeter gun. After the shooting, the defendant and Gray ran from the yard. As they

were running, people were chasing them, and the defendant turned and fired a starter pistol at the people. He and Gray then fled. After that conversation with the defendant, Kill told Assistant State's Attorney Bilyk what the defendant had said.

Bilyk questioned the defendant and wrote down what the defendant told him. The defendant then read what Bilyk had written down and signed what was identified as People's exhibit No. 38. (The statement was introduced but has not been made part of the record on appeal.) Bilyk read the contents of the statement to the jury.

The defendant told Bilyk that at 8:30 p.m. on November 7 he was at 28th and Hamlin with Chavo, Crook and Juan Miguel. The defendant was a member of the Two-Sixer Boys, and Crook and Juan Miguel were members of the City Boys street gang. A boy named Chavo drove up in a red Cadillac and said that some members of the Ambrose street gang came over to K-town and shot at them. The defendant saw a bullet mark in the trunk. Three other cars drove up; one of them was a brown Pontiac Bonneville. In the three cars were members of different branches of the Two-Sixers gang. They all discussed going to look for the members of the Ambrose gang who had shot at Chavo. He got in the Cadillac with Chavo and went looking for the Ambroses. They looked around for awhile and then went to a restaurant where they ran into Billy and Danny. Billy and Danny got in the red Cadillac and later switched to a black Cadillac. They met with the other cars at the Five Sisters Restaurant at 31st and Springfield. At the restaurant they decided to go to 63rd and Washtenaw because they thought they could find the Ambroses there.

When they got to 63rd Street, one car parked in front of the house where the party was, and one car parked on the corner of 63rd and Washtenaw. Chavo drove the Cadillac into the alley. Chavo stopped the car a couple of houses away from the house where the party was. Chavo turned out the headlights but left the car running. The defendant and Chavo then got out of the car, jumped over the fence and went into the yard where the party was.

Once in the yard he saw Jason Gray and three other people at the back basement door shooting into the basement. He heard about eight shots. He said that Eddie Rodriguez was in the back yard a few feet behind Jason when the shooting occurred. After the shooting he jumped over the fence and ran back to the car. Several of the Ambroses were running after him and Chavo. They got in the car and started driving away with the lights off. He grabbed a blank gun, a revolver from the Cadillac, and started shooting at the people chasing him. They drove back to Hamlin and 28th Street, and he went home.

Crook, Chavo, Billy, Danny and Eddie Rodriguez are not further identified in the record.

Several other people who were at the party testified for the defense. Jessie Villagomez testified that on the day of the shooting he was a member of the Ambrose gang, an ally of the Two-Two Boys. The victims were all friends of Villagomez. At some point during the evening, two girls came to the door. He opened the door, but he did not let them in. He did not see the girls "representing," that is giving Two-Six hand signals. Around 12:15 a.m., he was talking to Mike Villasenor when he heard a knock at the basement door. He reached for the door, and he saw Joe Torres looking toward the door. He heard gunshots; he looked at the door and saw a hand holding a black automatic gun. He did not see the defendant. The door was open six to eight inches, and Villagomez was behind the door. He did not see Jessie Alvarez run out the back door. Villagomez was a convicted felon.

Vito Balice and Noe Gonzalez testified that they came to the party with Kenny Carmona shortly before the shooting. As they entered the back yard, they were approached by three boys who asked them whether they were members of the Ambrose gang. Gonzalez testified that he did not see anyone in the back yard who was about 5 feet 1 inch or 5 feet 2 inches tall. Balice testified that the defendant was not one of the three boys. Balice and Gonzalez were also convicted felons; both were serving prison sentences at the time they testified.

Jose Mendez, one of the victims of the shooting, also testified for the defense. He was a Two-Two Boy at the time of the shooting and a friend of the three boys who were killed. He was standing near the back door around midnight; he did not see Jessie Alvarez anywhere near the back door. Shortly after midnight, he heard loud sounds, like firecrackers; he turned toward the back door and saw what appeared to be sparks. He did not see Jessie Alvarez run out the back door. When he walked toward the back of the room, he realized that he had been shot in the chest.

The defendant did not testify. Members of his family and a neighbor testified that the defendant and his brother Jose had stayed at home with their two-year-old nephew on the night of the shooting. The other members of his family had gone to his uncle's wake. When the other members of the family arrived home, Jose was watching movies and the defendant was sleeping on an air mattress on the living room floor. A neighbor, Bertha Chavez, came over to lend the Bobes some money. She gave the defendant's father $500, and he executed a note for the loan. Mrs. Chavez testified that she saw the

defendant get up from the floor and go into the bathroom. She stayed until about 1:30 a.m. and then went home.

Jose DelGadillo testified that he was with the defendant on November 7 from 6:30 or 7 p.m. until 11:45 p.m. They walked around the neighborhood and then rented some videos. They took the movies to the defendant's home and watched them with the defendant's brother Jose and his nephew. They ordered a pizza, which was delivered around 10 p.m. When DelGadillo left at 11:45 p.m., the defendant was asleep on the living room floor. He denied that he was a member of the Two-Six gang.

In rebuttal, Officer Thomas McMahon testified that he spoke with DelGadillo, who was then under arrest, and DelGadillo told McMahon that he was a member of the Two-Six gang. The State also called Theresa Rosa, DelGadillo's mother. She testified that she did not know where her son was on the night of November 7, 1986. The State impeached her testimony by proving that she had previously told an assistant State's Attorney that her son was with her from 8 p.m. on the night of November 7, 1986.

In his claim that his participation in the murders was not proved beyond a reasonable doubt, the defendant emphasizes that Alvarez was a member of a rival gang and did not tell the police officers everything to which he later testified. He also emphasizes the recantation by Rahder. Similar deficiencies in the evidence were present in *People v. Fields* (1990), 135 Ill. 2d 18, 552 N.E.2d 791, in which the defendant argued that the State's witnesses were untrustworthy because they were members of a rival gang. Additionally, two of the State's witnesses failed to tell the police immediately after the shooting that they recognized the defendant as one of the gunmen and witnesses recanted their testimony. In spite of the gang affiliations of the State's witnesses, certain witnesses' recantation of their testimony and numerous inconsistencies in their testimony, the supreme court held that the evidence established the defendants' guilt beyond a reasonable doubt. The supreme court pointed out that recantations are generally regarded as unreliable and that it was for the trial judge to determine the credibility of the recantation after having examined the demeanor of the witness.

■ In the case before us, we cannot conclude that the trial judge erred in rejecting Rahder's recantation. The identification of the defendant by Alvarez, who had known the defendant before the shootings, was corroborated to some extent by Rahder, despite his later recantation, and also to some extent by Holly McGuire, who, like Alvarez, identified Jason Gray as the shooter and who testified that

there were two or three other people in the doorway with Gray. Moreover, Alvarez's testimony was corroborated to a great extent by the defendant's statements to Officer Kill and to Assistant State's Attorney Bilyk. We judge that the defendant's participation in the murders was proved beyond a reasonable doubt.

We turn now to the claims of trial error. The defendant filed a motion to quash his arrest and suppress items seized from his home immediately before his arrest. The trial judge denied the motion to quash the arrest, finding that the police officers had probable cause to arrest the defendant and that their warrantless entry into the defendant's home was justified by exigent circumstances. The judge did grant the defendant's motion to suppress a photograph which had been seized from his home.

Miguel Bobe, the defendant's brother, was the primary witness for the defense on the motion to quash the arrest. He testified that seven officers arrived at his home around 10:30 a.m. on November 8, 1986. Miguel was the only person at home; the rest of the family was at a funeral. Four officers rang the front doorbell. When Miguel opened the door, one of the officers placed his left forearm against Miguel's chest and pushed him out of the way. The officers then entered the house without Miguel's consent.

The officers searched the house, and then asked Miguel if they could wait for his brother, Manuel, to return. Miguel told them that they could stay. The defendant and other members of his family arrived home around 3:30 or 4 p.m. All members of the Bobe family testified that when they entered the living room, the police officers first grabbed Jose Bobe and held his hands behind his back. The officers asked which one was Manuel Bobe, and several family members pointed to the defendant. Manuel's sister, Ernestina, and his father, Miguel Bobe, Sr., both testified that the officers made a gesture indicating that Manuel was too short or too small to be the person they were looking for.

Two of the arresting officers testified for the State on the motion. Officer Bloore, a gang crimes specialist, testified that when he arrived at work the morning of November 8, 1986, he read the case report prepared by the officers who had been summoned to the party after the shooting incident the night before. The case report gave the nicknames of four suspects: Stony, Inky, No-Neck Rabbit, and Little Hawk. ("Inky," or "Iggy," was later identified as Ignacio Miguel; "No-Neck Rabbit" was identified as Raoul Grimaldo.) Bloore received additional information from the detectives working on the case which indicated that the shooters were members of the Two-Six gang and

that one suspect's nickname was possibly "Little Hulk," rather than "Little Hawk." The detectives told Bloore that the suspect was one of the people who had fired a handgun and killed three people in a basement. The detectives also told Bloore that "Little Hawk or Hulk" spent time in the area of 38th and Albany.

Bloore spoke with an informant around 11 a.m. that day. Bloore had known the informant for approximately two years and had spoken with him on about a dozen occasions. The informant had given Bloore information regarding gang activity, gang members, gang locations, known hangouts of gang members, and gang organizational charts. The informant was not paid for his information, and the information he had given Bloore in the past had always been accurate.

Bloore asked the informant if he knew anyone from the Two-Sixers called "Little Hawk" or "Little Hulk." He gave the informant the physical description and age of the suspect. The informant told Bloore that he did not know of anyone named "Little Hawk" but he did know of a "Little Hulk," who was one of the leaders of the Two-Sixers. He told Bloore that Little Hulk lived at 2825 Avers and that his real name was Manuel Bobe. The informant showed Bloore Little Hulk's house at that address. The informant also gave Bloore a description of Little Hulk: he was about 16 or 17 years old, about 5 feet 4 inches tall, with dark black hair, parted in the center and combed straight back; he was called Little Hulk because he had a very husky build.

Bloore arrived at 2825 Avers with several other officers at around 1 p.m. They did not have a warrant for the arrest of Manuel Bobe. The officers knocked on the door, and Miguel Bobe opened the door. The officers identified themselves and asked if Little Hulk lived there. Miguel replied that Hulk was his brother and that he was at his uncle's funeral. Miguel told them that they could stay until his brother returned.

They asked if they could look around, and Miguel said that they could. The officers went upstairs, and Miguel told them that was where his brother slept. The officers noticed some gang graffiti and a poster, and they asked Miguel if his brother was a member of a gang. Miguel replied that, regrettably, his brother was a member of the Two-Six gang. On the reverse side of the poster was a computer picture, which Miguel said was a picture of the defendant. The poster contained various gang symbols which showed the Two-Six Nation ruling over a number of other gangs.

The defendant and his parents arrived home from the funeral around 3:30 p.m. The officers placed the defendant under arrest and

took him out to the squad car. Bloore then informed him that he was under arrest and read him his *Miranda* rights. Officer Casto, one of the other arresting officers, testified substantially to the same facts as Officer Bloore.

A reviewing court will not disturb a trial court's ruling on a motion to quash an arrest unless it is clearly erroneous. (*People v. Foskey* (1990), 136 Ill. 2d 66, 76, 554 N.E.2d 192.) Probable cause to arrest an individual exists where, when viewed objectively, the situation confronting the arresting officer, along with the facts known to him, are such as would cause a reasonable person to believe that the individual to be arrested had committed a crime. (*People v. Green* (1988), 179 Ill. App. 3d 1, 535 N.E.2d 413.) Although more than mere suspicion is necessary, evidence sufficient to convict is not required. *People v. King* (1987), 157 Ill. App. 3d 76, 511 N.E.2d 685.

■ The defendant's argument that the police lacked probable cause is based almost entirely on the fact that a police report read by Bloore referred to the suspect as "Little Hawk," rather than "Little Hulk." In our judgment, considering the totality of the evidence, the fact that the police report first read by Bloore referred to "Little Hawk" is insignificant.

Bloore's information about the shooting came from three sources. First, when Bloore arrived at work he read the case report prepared by the officers who had been called to the scene earlier that morning. The case report indicated that Jessie Alvarez had seen four people in the doorway, one of whom was "Little Hawk." The report further stated that Little Hawk was a 16- or 17-year-old Hispanic male, about 5 feet 4 inches tall, with a husky build and black hair parted in the center. Second, Bloore and other officers were briefed by Area 3 detectives. Bloore learned from the detectives that the person who fired at Alvarez might actually be "Little Hulk," and that he was a member of the Two-Six street gang. Third, Bloore then contacted his informant, who told him there was no member of the Two-Sixers named Little Hawk, but there was a Little Hulk, who was one of the leaders of the Two-Six gang. The description given by the informant matched the description previously given to Bloore by the detectives. (The defendant concedes that he fit the description.) From this information, Bloore concluded that Little Hulk was the person he was looking for. The informant told Bloore that Little Hulk's real name was Manuel Bobe, and he showed Bloore where Bobe lived.

After Bloore arrived at the defendant's home, Bloore learned facts that corroborated the informant. The defendant's brother told Bloore that his brother, Hulk, was, in fact, a member of the Two-Six-

ers and Bloore saw a computer picture of the defendant on a Two-Sixer poster.

In addition to evidence presented at the hearing on the motion to quash the arrest, the evidence presented at the trial may be used to sustain the denial of a motion to suppress. (*People v. Caballero* (1984), 102 Ill. 2d 23, 464 N.E.2d 223.) Bloore testified at the suppression hearing that he could not remember the names of the detectives who gave him the name "Little Hulk." The defendant contends that Bloore's failure to remember the names of the detectives casts doubt on his testimony. However, Jessie Alvarez testified at trial that he told two uniformed officers and a plainclothes detective that one of the four persons in the doorway was a boy whose nickname was "Little Hulk," and whom Alvarez knew from Kelly High School. In our judgment the collective information relied on by the arresting officers was sufficient to support a finding of probable cause. In any event, we cannot say that the trial judge's finding that probable cause for an arrest existed was against the manifest weight of the evidence.

The defendant cites *People v. Hollins* (1988), 169 Ill. App. 3d 304, 523 N.E.2d 1309, in which the appellate court reversed the trial court's denial of the defendant's motion to quash his arrest. In *Hollins*, the arresting officer relied on another officer's statement that "someone" told him that the defendant had been involved in a burglary. (*Hollins*, 169 Ill. App. 3d at 306.) The officer had no information linking the defendant to the crime, other than the investigating officer's statement that "somebody" told him that the defendant had been involved. The appellate court held that the information was especially unreliable because there was no indication that the investigating officer had interviewed any eyewitnesses to the crime. In contrast to *Hollins*, the officers in the case before us did interview eyewitnesses to the shooting. The key eyewitness, Alvarez, gave the police officers the information which ultimately led to the arrest of the defendant.

The defendant alternatively contends that, assuming that his arrest was legal, his statement was not voluntary because he was held by the police in a coercive environment. At the hearing on the motion to suppress the defendant's statement, the judge heard testimony from several police witnesses, as well as the defendant's father and brother, two other boys who were picked up and questioned that same day and the defendant himself.

The defendant testified that three officers arrested him and took him to the police station on November 8, 1986. While they were in the car, the officers asked the defendant if he knew anything about what had happened. One of the officers said that the defendant knew

something about the party; when the defendant replied that he did not know what the officer was talking about, the officer slapped him in the face. Another officer asked the defendant if he knew Iggy, Rabbit or Stony. None of the officers advised him of his rights.

The defendant directed the officers to Raoul Grimaldo's house, and the officers put Raoul (Rabbit) in the car with the defendant. The officers next picked up Robert Sanchez as he was walking down the street in front of Raoul's house. The officers then drove around, looking for Ignacio Miguel. (There appears to be some confusion over whether the officers were looking for "Inky" or "Iggy." Ignacio Miguel testified that his nickname was "Iggy." The police officers testified that they were looking for "Inky.")

The officers stopped at Ignacio's house and called for a backup. Another squad car came to the house. The officers left when they found out that Ignacio was not home. About two hours later, the officers finally found Ignacio working on a car with Victor Delamora. Two of the officers jumped from their car, and one of them pulled out a gun. The officers handcuffed Ignacio and Delamora and put them in the back seat of the police car.

When the officers arrived at the police station, they took the boys to the basement. One of the police officers kicked one of the boys and told him to speak up louder. The officers then took the boys to the second floor and put the defendant in a room by himself. He was worried, and he began throwing up. He asked to go to the washroom, and an officer took him into the washroom where the defendant saw Ignacio Miguel. The officer asked the defendant why he did not just take the blame by himself. The defendant threw up again. The officer told him that he was going to get natural life. The defendant said that he did not know anything. He asked if he could see his parents or an attorney, and the officers said, "No, until you sign some papers and say you did the shooting."

A police officer questioned him in the presence of youth officer Mary Dahl, and he told the officer that he did not know anything. The defendant asked if he could speak with his parents or a lawyer. The officers told him that they wanted him to sign a confession. The defendant was handcuffed to a chair; he had not eaten; and when he asked for water, the officers told him, "You have to do something before you can get anything."

The defendant testified that Officer Kill came into the room three or four different times. When Kill first came into the room, he asked if the defendant wanted to tell him what had happened at the party. Kill did not advise him of his rights. The defendant asked if he could

speak with his parents or a lawyer, and Kill said no; he told the defendant he wanted him to sign a statement. About an hour later, Kill returned to the room and again asked the defendant if he wanted to talk about what had happened at the party. Kill again told the defendant he could not speak to his parents or an attorney.

When Kill came into the room a third time he put his foot on the defendant's knee. Kill appeared upset; he asked Manuel if he knew what had happened. When the defendant said that he did not know, Kill became angrier, and he hit the defendant in the chest with his fist. The defendant began to cry. Kill then grabbed the defendant's shirt and hit him in the face with an open hand. Kill grabbed him by one hand and said, "This is what happened, right?" The defendant said that he did not know what had happened; Kill took out his gun, and said, "This is what you did at the party. What you want me to do with you?" Kill put the gun on the defendant's neck and said, "What do you want me to do; what you did at the party?" Kill asked the defendant why he was going to take the fall himself and told him that he should take someone with him. Kill suggested that Bobe implicate Ignacio, Rabbit and Stony. Kill said that Jason Gray had already signed a statement implicating the defendant.

After Kill left, two detectives came in and spoke with the defendant for about 10 minutes. They asked the defendant if he was ready to sign a confession, and he replied that he was not going to do so.

The defendant also testified that Assistant State's Attorney Bilyk next entered the room and questioned him. He could not remember what answers he gave to Bilyk's questions. Bilyk left the room about three or four times during the interview. Bilyk showed him a piece of paper with words on it, and he signed it. He was not able to read or write the words on the paper. He was given a reading test before he went into the Audy Home, and he was told that his reading level was 3.4 or 3.2. He said that he signed the piece of paper because he was getting tired and Officer Kill said that if he signed the paper he could go home.

On cross-examination, the defendant admitted that while Bilyk was questioning him, Bilyk was writing down the defendant's answers. The defendant could not remember any of the questions or answers. He did not remember Bilyk saying that the document was a written statement of what the defendant had told him. He did not remember reading portions of the document aloud to Bilyk. Bilyk told him that the waiver of rights form was simply a form that said he had been at the police station.

During the course of the evening, the defendant asked to speak with his father at least eight times. None of the officers ever told him that his father was at the police station. He asked to speak with a lawyer approximately four times.

After he signed the document given to him by Bilyk, the defendant was taken to another station and processed. Later, he was taken to the Audy Home. On November 11, he was examined by a doctor at the Audy Home. The defendant told the doctor about his stomachaches, and he also told the doctor that he had been beaten by the police.

The defendant's father testified that the police gave the defendant's brother, Miguel, a business card with the police station's telephone number. When he asked the officers if he could go with his son, the officers said, "No, you stay inside your house."

He testified that around 7 o'clock that evening, he called the police station at 39th and California and was told to wait, because the officers did not know what was happening. He and his son, Enrique, immediately went to the police station. When they arrived, an unidentified officer told him that his son was in the station but that he could not see him. After another half hour or 45 minutes, he again tried to see his son, and another unidentified officer told him that he could not see the defendant. He left the station around 10:30 p.m. after an officer told him to go home because there was no chance that he would be able to see his son. When he got home he made four or five phone calls to the station but was unable to get any information about his son. Around 8 or 9 o'clock the next morning, he called the station again, and the officer who answered told him that he did not know where the defendant was. The officer gave him three or four phone numbers to try. He called all the numbers, and he eventually found out that his son was at the Audy Home. He went to the Audy Home around 1:30 or 2 o'clock that afternoon and was able to speak with the defendant. Enrique Bobe's testimony was substantially the same as that of his father.

Ignacio Miguel and Victor Delamora testified that after they were arrested they were put in the car where they saw the defendant, Robert Sanchez, Raoul Grimaldo, and "some other guys." They were taken to the station at 39th and California, and all of them were put in a cell in the basement. Shortly thereafter, Ignacio's three brothers, Raoul, Ricardo and Manuel, were also placed in the cell. A police officer kicked one of the boys because he did not speak loud enough.

After about an hour, the boys were taken to a hallway on the second floor and handcuffed to each other. One of the officers struck Ig-

nacio in the stomach with his fist. The officers asked Ignacio if he was at the shooting the night before. Ignacio did not ask to speak with his parents. He and Victor were placed in three lineups.

After the lineups, an officer took Ignacio into a washroom and asked him questions about the previous night. Ignacio saw the defendant in the washroom. The officers were threatening the defendant and telling him that he was "going to get life." The defendant was crying and throwing up. Ignacio did not see any officers strike the defendant while in the washroom. Ignacio was next placed in an interview room by himself, and he was handcuffed to a chair. He continued to tell the officers that he did not know anything about the shooting. Ignacio was eventually taken home around 1:30 a.m.

The State's witnesses on the motion to suppress the statement were three police officers, one youth officer, an assistant State's Attorney, and a doctor from the juvenile detention center. The officers and the assistant State's Attorney denied knowledge of any mistreatment of the defendant or of any misrepresentations having been made to him. They also testified that the defendant never asked to see a lawyer or his parents.

Detective Joseph Gandurski first came in contact with the defendant around 6:45 p.m. on November 8, when Gandurski was organizing a lineup. He asked if anyone needed to use the washroom, and the defendant replied that he did. Gandurski and Officer Koclanis first questioned the defendant around 7 or 7:15 p.m., in the presence of youth officer Mary Dahl. Gandurski introduced himself and the other two officers and explained why they were there. He then read the defendant *Miranda* rights from a police handbook. Gandurski read the defendant each of his rights individually, and after each one, the defendant responded that he understood. Gandurski told the defendant he had been identified in the lineup. Between interviews, the defendant was handcuffed to a ring on the wall; however, the defendant was not handcuffed while the officers were interviewing him.

Detective John Koclanis' testimony was substantially the same as that of Gandurski.

Youth officer Mary Dahl testified that she learned from the defendant that he was about 16 years old. She asked Gandurski or one of the other detectives where the defendant's parents were, and she was informed that they were at home. She did not request Gandurski to have the parents present during questioning. Gandurski explained to the defendant that he could be tried as an adult for the crime they were investigating. The defendant indicated that he understood this. Although Gandurski did not recall asking the defendant

whether he could read or write, Dahl testified that Gandurski did ask the defendant if he could read and write, and he responded that he could. The interview lasted somewhere from 15 minutes to one-half hour.

Detective Michael Kill testified that he came on duty at 4:30 p.m. on November 8. At that time, he was not involved in the investigation of the homicides that had occurred at 6318 South Washtenaw. Around midnight, he entered an interview room to get a cup of coffee, and he saw the defendant in the room. The defendant initiated a conversation with Kill, asking whether he was in any trouble. Kill replied, "I don't know." The defendant asked Kill if he could talk to him; Kill replied, "Sure," and asked the defendant if he had been advised of his rights. The defendant said that he had. The defendant then made an oral statement to him regarding the shooting. The conversation lasted approximately five to seven minutes; Kill left the room and told the detectives involved in the investigation what the defendant had said. The defendant had told him that he was outside the party, but he did not do the shooting; Jason Gray did the shooting with a nine-millimeter handgun. When Gray finished shooting, they ran from the yard. People were chasing them; the defendant turned and fired a starter pistol, and the people fled.

Gandurski and Koclanis saw the defendant again around 12:15 a.m. on November 9, 1986, along with Assistant State's Attorney Thomas Bilyk. Bilyk testified that he introduced himself and explained that he worked with the police and that he was not the defendant's lawyer. He asked if the defendant understood, and the defendant replied that he did. Bilyk then gave him his *Miranda* rights. Bilyk asked the defendant if he wished to give a statement, and the defendant responded that he did. The defendant then gave an oral statement. Bilyk was in the interview room for approximately 20 to 25 minutes; Bilyk, Koclanis and Gandurski then left the room.

Bilyk and Gandurski reentered the room around 12:45 a.m. Bilyk had three sheets of paper, one of which was partially filled out. Bilyk had filled out the heading at the top of the page; he had also filled in the first paragraph of the statement, indicating that he had introduced himself and had given the defendant his *Miranda* warnings. Bilyk subsequently filled out the remainder of the first page and the second and third pages. After Bilyk finished writing out the statement, he handed all three pages to the defendant, who read the statement aloud. When the defendant finished reading the *Miranda* warnings, he signed his name below them. He then went through the rest of the statement. He did not read every word of the statement aloud;

Bilyk would periodically tell him that he could read by himself. To make sure the defendant was continuing to read the statement, Bilyk would tell him to read aloud again. At the bottom of each page, Bilyk asked him to sign it, if it was accurate. The defendant signed each page.

Dr. Ipathy Rao testified that on November 10, 1986, he was on duty as a doctor at the Juvenile Temporary Detention Center. His job was to examine the juvenile boys brought to the detention center. Dr. Rao examined the defendant and asked him whether he had any complaints or recent injuries. The defendant replied that he did not have any complaints or injuries. Dr. Rao did not notice any bruises or cuts on the defendant. The defendant did not tell Dr. Rao that he had been beaten by police officers or anyone else.

In his summation which preceded the denial of the defendant's motion to suppress his statement, the trial judge expressed some criticism of the procedures followed by the police. It was his impression that the police officers, without probable cause, had picked up several persons other than the defendant that they knew were members of the Two-Six gang. The judge, however, conceded that there was no evidence to support that conclusion. The judge also said that he believed it "to be protocol" to have a juvenile officer present when a minor is questioned. He observed that juvenile officers were "hired for the express purpose of being present for the purpose of statements." He concluded that "all of those guidelines have been violated in this case." The judge said that the defendant was an "articulate, street-wise young man" who understood the *Miranda* warnings and had the capacity to read and write. He also said that he did not believe the defendant's testimony about coercion, threats and promises. He found that under all the circumstances the defendant had made a knowing and intelligent waiver of his rights and knowingly and voluntarily made a statement implicating himself in the shooting.

■ It is appropriate that we address first the trial judge's expressed impression that the police did not follow the proper procedures. Although that impression did not control the judge's ultimate decision, we do so because the defendant seizes upon the judge's remarks. The defendant maintains that his resistance was overcome by the fact that several of his friends were arrested allegedly illegally and that a youth officer was not present when Assistant State's Attorney Bilyk took the statement. The defendant also emphasizes that his father was not permitted to see him, the length of time he was in custody before he made the statement, he was alone in a room handcuffed and he was not fed.

Before passing judgment on the actions of the police, fairness requires that we set the stage that the police had to enter. We take judicial notice of the fact that gang warfare in urban areas poses one of the greatest problems facing the police, whose resources are not unlimited. The police were suddenly confronted with a horrendous crime: A brutal, planned home invasion and deliberate execution of three young men in a dispute between rival gangs. When Gandurski was asked what had happened between 7:15 p.m., when he first questioned the defendant, and 12:15 a.m., when the defendant made his statements to Kill and Bilyk, Gandurski answered, "We were conducting an enormous investigation." No fair-minded person would brand that answer of Gandurski an overstatement. An "enormous" crime required an "enormous investigation," and the police responded.

The record discloses that there were at least 12 detectives assigned to the investigation. There were also an undetermined number of uniformed officers involved. Seven officers participated in the arrest of the defendant alone. There were between 30 and 40 potential eyewitnesses in the basement at the time of the shooting, all of whom would ordinarily be questioned by the police. Holly McGuire testified that "most" of the people in the basement went to the station that night and that the police were "asking everybody questions." The police knew that there were a substantial number of persons who possibly were involved in the shooting. They also knew that a member or members of the Two-Six gang did the shooting. That the police would want to question members of the Two-Six gang is understandable. We have no way of knowing what facts were known to the police upon which to base the arrest of the seven or eight individuals other than the defendant. Consequently, the statement of the defendant that others were arrested illegally is pure speculation. As noted by the trial judge, it is not supported by the record. Moreover, we agree with the State that any illegality in the arrest of others is not relevant, at least where it is established that the arrest of the defendant was legal.

We turn now to the question of whether certain guidelines were violated. Because the defendant has not told us what those guidelines were, we have searched the record. Gandurski was asked if it was "ordinary procedure" to have a youth officer present with a juvenile, and Gandurski answered, "It's recommended someone be present with a juvenile."

On cross-examination, youth officer Dahl was asked what she perceived to be her "function" or "purpose." She answered, "To be sure that he [the defendant] was advised of his rights and to be advised

that because of the seriousness of the crime, that he could be tried as an adult." Bilyk was asked if he knew whether the "most preferred method of questioning juveniles" is to have a parent present. Bilyk said he had no opinion as to what the most preferred method was. He was then asked whether it "seems to be desirable" to have a youth officer present if it was not possible to have a parent present. Bilyk said that he did not know. We find nothing in the record that supports the conclusion that police guidelines require that a youth officer (or a parent) be present when a juvenile is questioned. A "recommended" or "desirable" procedure is not synonymous with a "required" procedure.

Section 3—2 of the Juvenile Court Act (Ill. Rev. Stat. 1985, ch. 37, par. 703—2) provided that a law enforcement officer who takes a minor into custody shall immediately make a reasonable attempt to notify the parent "that the minor has been taken into custody and where he or she is being held," and that "the officer shall without unnecessary delay take the minor to the nearest juvenile police officer designated for such purposes." (The current version of the statute is Ill. Rev. Stat. 1991, ch. 37, par. 802—6.) The defendant does not maintain, nor could he, that the police did not comply with section 3—2. The police arrested the defendant in the presence of his parents. The defendant's father himself testified that the police told him that his son was being arrested for the charge of murder and that he was being taken to the 39th and California police station for questioning. The officers gave the defendant's brother a business card with the phone number of the police station. The police had youth officer Dahl present to monitor the 7 p.m. interview. She heard the officers advise the defendant of his rights and the fact that he could be tried as an adult. Therefore, we conclude that the police followed the statute. We also conclude that there is nothing in the statute requiring that a youth officer be present when a minor is questioned.

█ The cases cited by the defendant do not support the defendant's argument that police refusal to permit the defendant's father to see him rendered the statement involuntary. In fact, they support the position of the State. The defendant first cites *People v. Brown* (1989), 182 Ill. App. 3d 1046, 538 N.E.2d 909, in which the mother of one of the defendants came to the police station and expressed her desire to see her son. She was not allowed to see him, and he later made an incriminating statement. The trial judge suppressed the statement. The appellate court affirmed the trial judge with these observations:

"[W]e recognize that a juvenile does not have a *per se* right in Illinois to consult with a parent before questioning or to have the parent present during questioning. [Citation.] However, where they indicate an interest by their presence, parents should be allowed to confer with their child before, and to be present during, any questioning. The presence or absence of the parent is a factor in evaluating the voluntariness of a statement or confession under the totality of the circumstances test. [Citation.]

\* \* \*

\*\*\* [T]he officers who know of the parent's presence have an affirmative duty to inform those actually questioning a juvenile of the parent's presence and request to see her child. And, in order to ensure the true voluntariness of a statement, those actually questioning the juvenile have an affirmative duty to stop the questioning and allow the parent to confer with her child." 182 Ill. App. 3d at 1053-54.

The court held that the defendant's inability to confer with his mother, *combined with* the failure of the police to advise the defendant of his *Miranda* rights, supported the trial judge's finding that the statement was coerced. In the case before us, although the defendant's father was prevented from seeing him, the trial judge found that the defendant had been advised of his rights and that he understood those rights. In fact, the defendant testified at the suppression hearing that he was aware of his rights. In this regard, this case is distinguishable from *Brown*.

The defendant also relies on *People v. Spivey* (1991), 209 Ill. App. 3d 584, 568 N.E.2d 327, and *People v. Knox* (1989), 186 Ill. App. 3d 808, 542 N.E.2d 910. In *Spivey,* as in *Brown,* the appellate court reviewed, under a manifest weight of the evidence standard, the trial court's suppression of the juvenile defendant's statements. The police officers in *Spivey* went to interview the defendant while he was in the hospital. The defendant and his mother both told the police that he was not going to answer any questions without the presence of his lawyer. The police officers left. Shortly thereafter, the defendant was released from the hospital, and as he attempted to get into his car, he was arrested and taken to the police station, where he later made incriminating statements.

The trial judge found that the defendant's statement at the hospital before his arrest constituted an invocation of his right to remain silent, and the giving of *Miranda* rights after his arrest was ineffective to overcome the previous invocation of his rights. Additionally,

the judge found that the police acted improperly by consistently questioning and harassing the defendant before advising him of his *Miranda* rights, by refusing to allow his parents to speak with him and by telling his attorney that he was not at the police station. The appellate court affirmed the trial judge's determination that the statements were involuntary, holding that his finding was not against the manifest weight of the evidence.

The case before us is distinguishable from *Spivey*: The defendant does not dispute that he was advised of his *Miranda* rights numerous times. For the purposes of this appeal, we must accept as true testimony that he never told the police that he did not want to answer any questions or that he wanted to see a lawyer or his parents. The record shows that the defendant understood the *Miranda* warnings. Moreover, unlike *Spivey* or *Brown*, the trial judge in the case before us made a factual determination that the defendant's statement was voluntary.

This case can also be distinguished from *Knox*. In *Knox*, the court stated, "We are most concerned that defendant's statement was made before defendant had an opportunity to confer, prior to questioning, with an adult interested in his welfare, either his parents or a juvenile officer." (186 Ill. App. 3d at 813.) Thus, *Knox* does not mandate that a juvenile be allowed to speak with his parents *and* a juvenile officer, and it also does not require that a concerned adult be present every time a juvenile is questioned. As the court expressly stated, the defendant in *Knox* was not allowed to confer with *any* adult interested in his welfare before being questioned. Indeed, the *Knox* court distinguished the facts before it from those in *People v. Stachelek* (1986), 145 Ill. App. 3d 391, 495 N.E.2d 984, noting that, although the parents of the defendant in *Stachelek* were not notified of his arrest, the defendant "was afforded the opportunity to confer with a youth officer, an adult interested in his welfare, prior to making any statement." (*Knox*, 186 Ill. App. 3d at 814.) The *Knox* court observed that this distinction between the facts before it and those of *Stachelek* was "crucial." 186 Ill. App. 3d at 815.

In the case before us, youth officer Mary Dahl was present during the defendant's first interview. The defendant was therefore "afforded the opportunity to confer with a youth officer, an adult interested in his welfare, prior to making any statement." 186 Ill. App. 3d at 814.

The defendant also points to the fact that he was handcuffed, alone and unfed in a room for several hours. Although we recognize that the mere existence of some discomfort is not sufficient to render

a statement involuntary (see *People v. Rhodes* (1983), 119 Ill. App. 3d 1002, 457 N.E.2d 1300), we wish to make it clear that we do not approve of all the treatment of the defendant, particularly leaving him unfed. We believe, however, that the circumstances justify the conclusion that the discomfort suffered by the defendant was caused by circumstances and was not a deliberate attempt on the part of the police to wear down the resistance of the defendant. The scene at 39th and California on the night of the shooting and the following day is not hard to imagine: At the station would probably have been members of the families of the slain boys, the eyewitnesses and members of their concerned families, police personnel preparing reports, changing shifts, dealing with the media, conducting at least three showups and interviewing a large number of witnesses, some of them reluctant to become involved. In addition, there were at least seven or eight other suspects who were being questioned. Under the circumstances, a fact finder could conclude that the police did not willfully neglect the defendant in an attempt to wear down his resistance.

When making a determination as to voluntariness, a court must look at the totality of the circumstances surrounding the making of the statement. (*People v. Mays* (1988), 176 Ill. App. 3d 1027, 532 N.E.2d 843.) A trial judge need be convinced only by a preponderance of the evidence that the statement was voluntary. (*People v. McCleary* (1990), 208 Ill. App. 3d 466, 567 N.E.2d 434.) A trial judge's finding of voluntariness will not be overturned on review unless it is shown to be against the manifest weight of the evidence. (*People v. Davis* (1983), 97 Ill. 2d 1, 452 N.E.2d 525.) Finally, it is the province of the trial judge, in deciding whether a statement was coerced, to resolve any conflicts in the evidence and to determine the credibility of the witnesses. (*People v. Clements* (1985), 135 Ill. App. 3d 1001, 482 N.E.2d 675.) The trial judge has made his decision that the evidence establishes that the defendant's statement was voluntary. That decision is not against the manifest weight of the evidence.

The defendant next contends that error occurred when the State impeached the testimony of the defendant's alibi witness, Jose DelGadillo. The prosecutor asked DelGadillo if he was a member of the Two-Six gang, and DelGadillo replied that he was not. The prosecutor impeached that testimony with a statement DelGadillo had made to Officer McMahon that he was a member of the Two-Six gang. The defendant concedes that impeachment of DelGadillo with a prior inconsistent statement was not improper. However, he contends that the manner in which the State conducted the impeachment was improper for two reasons: first, the State did not tender Officer McMa-

hon's arrest report to the defendant before trial; and second, the prosecutor repeatedly mentioned the fact that DelGadillo had been arrested.

■ We agree with the State that this issue has been waived because the defendant did not raise it in his post-trial motion. (*People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124.) Even in the absence of waiver, we find no reversible error. The judge correctly ruled that the State's failure to tender Officer McMahon's report to the defense counsel was not improper because the State had no way of knowing that DelGadillo would deny his gang affiliation and thus had no way of knowing that Officer McMahon's testimony would be pertinent.

All of the defendant's objections to any reference to the fact that DelGadillo had been arrested by Officer McMahon were sustained. Therefore, any error was minimized by the sustaining of the defense objections and by the jury instructions concerning the limited purpose of impeachment evidence. (*People v. Lilly* (1985), 139 Ill. App. 3d 275, 487 N.E.2d 414.) Moreover, we fail to see how evidence of DelGadillo's arrest prejudiced the defendant, since it was his position that the police had indiscriminately arrested people.

The defendant also contends that error occurred when the State was permitted to impeach its own witness. On the Sunday preceding the State's presentation of its rebuttal case, Assistant State's Attorney Calabrese and Officer Sylvester Baker interviewed Jose DelGadillo's mother, Theresa Rosa, at her home. Rosa's boyfriend, Robert Nosko, was also present. The State called Rosa and Nosko to rebut DelGadillo's testimony. They called Baker to impeach Rosa.

The prosecutor asked Rosa where her son Jose was on the evening of November 7, 1986. She answered that she did not know. She said that she had arrived home at 4 p.m., and Jose had left sometime after that. The prosecutor then asked Rosa if she had told Assistant State's Attorney Calabrese and Officer Baker on the previous Sunday that her son was with her from 8 p.m. through the rest of the night of November 7, 1986. She denied that she had told them that her son was home from 8 p.m.; she said that she told them that Jose was home with her when the shooting occurred, whatever time that was.

The State then called Robert Nosko. Nosko testified that he was living with Rosa in November of 1986, and he was not sure where Jose was on the night of November 7, 1986. He was present when Calabrese questioned Rosa, and he admitted that Rosa told Calabrese that her son came home around 8 or 9 p.m. on November 7, 1986. He qualified that statement by adding that he and Rosa "weren't a hundred percent sure of any time." After Calabrese left, Nosko

"thought" that the defendant came home at 11 p.m. The State's final witness was Officer Sylvester Baker, who testified that Rosa told Calabrese that her son had come home at approximately 8 p.m. on November 7, 1986, and had stayed with her the entire evening.

Both sides recognize the general rule that parties may attack the credibility of their own witnesses. (134 Ill. 2d R. 238(a).) Both sides also recognize that the right to impeach one's own witness' testimony exists only if that witness' testimony has damaged, rather than simply failed to support, that party's position. In *People v. Weaver* (1982), 92 Ill. 2d 545, 442 N.E.2d 255, the supreme court announced the rule and the reason for it:

> "A court's witness, or any witness for that matter, cannot be impeached by prior inconsistent statements unless his testimony has damaged, rather than failed to support the position of the impeaching party. The reason for this is simple: No possible reason exists to impeach a witness who has not contradicted any of the impeaching party's evidence, except to bring inadmissible hearsay to the attention of the jury. Impeachment is supposed to cancel out the witness' testimony. It is only when the witness' testimony is more damaging than his complete failure to testify would have been that impeachment is useful. [Citations.]" 92 Ill. 2d at 563-64.

■ It is fairly arguable that Rosa's testimony that her son was not home was more damaging to the State's position than her complete failure to testify would have been to the State. Her testimony buttressed the alibi testimony of her son. Nonetheless, we have determined that we need not decide the issue because Nosko established that Rosa told the assistant State's Attorney that her son came home around 8 or 9 p.m.; and the defendant does not assign the testimony of Nosko as error. Officer Baker's testimony was principally cumulative of that part of the testimony of Nosko and, therefore, harmless, if it was error.

The defendant next contends that the State impermissibly shifted the burden of proof to the defendant during closing argument. On direct examination, DelGadillo testified that he and the defendant had rented videos and ordered a pizza on the night of the shooting. On cross-examination, the prosecutor asked DelGadillo whether he had receipts from the pizza and the video store, and he replied that he did not. He said that he had spoken to the defendant's attorney within a week or two of the killing and had told the defense attorney about the pizza and the video. He also testified that he did not have a receipt

from the video place. No objections were made to the prosecutor's questions.

During the closing argument the following occurred:

"PROSECUTOR: Let's think of another witness. Let's be [defense counsel]. I call to the witness stand the pizza driver that night. Mr. Pizza Driver, what can you tell us about that night? Mr. Pizza Driver? This is the longest I have ever waited in my life for a pizza driver, eight days. [Defense counsel] knew about this case, talked—

DEFENSE ATTORNEY: Objection, Judge.

THE COURT: I will let counsel continue his argument.

PROSECUTOR: He knew right after the incident happened. He could have gone out and brought you the driver.

DEFENSE ATTORNEY: Objection.

THE COURT: I would agree, ladies and gentlemen, the defense does not have to prove anything. You may continue with your argument.

PROSECUTOR: No pizza driver to say I gave the pizza to them to corroborate their story, an objective witness. Okay, not the pizza driver. How about [defense counsel] calling the witness from up here. I called the person who answered the phone and took the order. Didn't hear from them either.

DEFENSE ATTORNEY: Same objection.

THE COURT: I will let counsel continue the argument.

* * *

PROSECUTOR: How about the route manager or how about the guy who owns the company to save the receipts, here's where we went, or even how about a receipt in the trash. Supposedly they had this pizza Friday night. You know how the cardboard comes with who delivered it to who or whatever. Where's that? You don't have that either, do you? We have no objective witnesses. How about something else, [defense attorney]? Where's the objective witness from the video store? Yes, they have an account here. Yes, they rent movies. I rented them, ABC movie. You know they got records because if you don't bring it back, they are on the phone to you.

DEFENSE ATTORNEY: Object.

THE COURT: I would ask the jury to disregard it.

PROSECUTOR: They are not here either. Isn't that something? They're not here either; no objective witnesses, only family members * * *."

■ We must reject the defendant's contention now made that the State's argument shifted the burden of proof to the defendant. First, he did not properly preserve the point in his post-trial motion. (*People v. Phillips* (1989), 186 Ill. App. 3d 668, 542 N.E.2d 814.) Second, we do not believe that the defendant preserved in the trial court the error he now assigns. His objection was not specific and may be construed to be an objection to the prosecutor's factual statement concerning what the defendant's attorney knew and did and to the prosecutor's statement of fact as to the records kept by the video store and the practice of the video store when movies are not returned. Third, the comments do not constitute a reference to the defendant's failure to testify as did the remarks in *People v. Tipton* (1991), 222 Ill. App. 3d 657, 584 N.E.2d 310, cited by the defendant or *People v. Clark* (1989), 186 Ill. App. 3d 109, 542 N.E.2d 138, also cited by the defendant.

The question of the propriety of prosecution comments on the absence of alibi witnesses has been raised in courts of review of this State with inconsistent results. In *People v. Sanford* (1968), 100 Ill. App. 2d 101, 241 N.E.2d 485, the defendant testified that at the time of the arson for which he was on trial, he was in a tavern. During cross-examination, he testified that the owner and barmaid were present. Neither the owner nor the barmaid was called by the defense. The State commented on their absence, and the defendant assigned the State's comments as error. The First District Appellate Court affirmed the conviction.

The court held that the prosecutor had not argued that the defendant failed to call the tavern owner and barmaid as witnesses because their testimony would have been adverse to him. The court also noted that the witnesses were not equally available to both sides:

> "There is nothing in the record to indicate that the State knew prior to the defendant's testimony that he would claim an alibi or whom he would name as witnesses to support his story that he was in another place at the time of the crime. The defendant knew who they were and could have had them on hand, the State could not. After the witnesses were named, the trial would have had to be recessed, perhaps to some other day, for the State to have subpoenaed them." 100 Ill. App. 2d at 105.

The *Sanford* opinion was not followed in *People v. Mays* (1972), 3 Ill. App. 3d 512, 277 N.E.2d 547, in which the Third District Appellate Court held that the rule permitting comment on the absence of witnesses applied only where the defendant had identified the witnesses on direct examination and did not apply where the identity of

the witnesses was disclosed on cross-examination. In *People v. Eddington* (1984), 129 Ill. App. 3d 745, 473 N.E.2d 103, the Fourth District Appellate Court cited *Mays* with approval and held that comment on the absence of witnesses was not permissible when the existence of the missing witnesses was interjected into the case through State witnesses.

The *Sanford* opinion cited *People v. Gray* (1965), 57 Ill. App. 2d 221, 206 N.E.2d 821, in which the defendant's fiancee testified that at the time of the robbery the defendant was with her and her parents at her home. In closing argument, the State referred to the failure of the defendant to bring in the parents of the defendant's fiancee. The First District Appellate Court found no error. We judge that the *Gray* case, which involved testimony of a witness, not the defendant, is factually apposite to this case. Therefore, the precedent in the First District Appellate Court supports the State's position here.

The issue was before the supreme court in *People v. Nilsson* (1970), 44 Ill. 2d 244, 248, 255 N.E.2d 432, in which the court spoke as follows:

> "The final point raised by defendant concerns the prosecutor's reference, during closing argument, to defendant's failure to support his alibi with the testimony of the alleged alibi witnesses. The authority in Illinois is conflicting on the question whether such comment is improper. (See *People v. Rubin*, 366 Ill. 195, 198; *People v. DeLordo*, 350 Ill. 148, 161-62; *People v. Munday*, 280 Ill. 32; *People v. Smith*, 74 Ill. App. 2d 458, 463-64; but see *People v. Swift*, 319 Ill. 359, 365-66; *People v. Smith*, 105 Ill. App. 2d 8, 11-12; *People v. Sanford*, 100 Ill. App. 2d 101, 104-05.) There can be no question, however, as to the rule that improper remarks do not constitute reversible error unless they result in substantial prejudice to the accused. (*People v. Stahl*, 26 Ill. 2d 403, 406; *People v. Swets*, 24 Ill. 2d 418, 423; *People v. Berry*, 18 Ill. 2d 453, 458.) Since we are of the opinion that the prosecutor's remarks here were so minor that they could not have been a material factor in defendant's conviction, and therefore cannot constitute reversible error, we need not consider their propriety."

We believe that the posture of this case is identical to that in *People v. Nilsson*. The prosecutor's remarks here were so minor that, *if* they constituted error, they could not have been a material factor in defendant's conviction when we consider the nature of the State's proof. See also *People v. Tolefree* (1973), 14 Ill. App. 3d 754, 303 N.E.2d 555.

The defendant next contends that error occurred when the judge gave the following instruction:

"Evidence has been received that the defendant has been involved in offenses other than that charged in the indictment. This evidence has been received solely on the issue of the defendant's identification or motive or knowledge. This evidence may be considered by you only for the limited purpose for which it was received."

When the State tendered the instruction, the defendant objected, and the prosecutor explained that the instruction was meant to refer to the earlier incident at the 7-11 store and the bottle-throwing incident between the two cars, incidents to which Alvarez and Rahder had testified. The defendant's attorney argued that those incidents could not be characterized as "offenses." He did not and does not make any issue of the fact that the instruction included motive and knowledge. His argument, rather, is still that there was no proof of any other "offense" committed by the defendant. In its brief, the State again points to the occurrences at the 7-11 store and the bottle throwing as support for the instruction. (During oral argument, the prosecutor told us that the defendant's firing some type of gun at Alvarez was also another "offense" that could justify the giving of the instruction.)

■ The defendant did not assign the giving of the instruction as error in his post-trial motion; consequently, any error is waived. Even in the absence of waiver, we find no prejudicial error in the giving of the instruction. We agree with the trial judge that the evidence of the other occurrence at the 7-11 store and the bottle-throwing incident was admissible to bolster the identification of Alvarez; and we agree with the trial judge that a fact finder could conclude that the defendant participated in the bottle-throwing incident, which could be considered an "offense." (The State has not referred us to any specific provision of the criminal code or city ordinances.) Moreover, even if the bottle-throwing incident was mischaracterized, the giving of the instruction would not necessarily require a reversal. (See *People v. Vanda* (1982), 111 Ill. App. 3d 551, 444 N.E.2d 609.) The State made no reference to the instruction in argument. Because the defendant has failed to convince us that prejudice resulted from this instruction, we hold that the judge did not err in giving it.

■ The defendant maintains that the prosecutor's questioning improperly implied that Jose Mendez was testifying under pressure from the Two-Six gang; that Noe Gonzalez testified to curry favor with the defendant's attorney; and that the defendant's attorney was conceal-

ing a witness. We find no reversible error in the State's questioning to which the defendant refers. Any errors were waived either by failure to object to the questions or to raise the errors in the post-trial motion; or objections were sustained to the questions; or the defendant draws inferences from the questions that are not justified.

We also find that no error occurred when the prosecutor elicited from Bertha Chavez the fact that she had talked to the defendant's attorney. See *People v. Scarpelli* (1980), 82 Ill. App. 3d 689, 402 N.E.2d 915.

The defendant also argues that the State elicited inadmissible hearsay to bolster the credibility of Officer Bloore and Holly McGuire.

■■ Officer Bloore testified that "Little Pie" was one of the nicknames of the defendant he had been given when he went to look for suspects. No objection was made to that testimony. On cross-examination, the defendant's attorney attempted to show that Bloore had not been given the name "Little Pie." On redirect examination, the prosecutor asked whether Bloore had asked "some of the family members" about the defendant's nicknames. An objection was sustained. The defendant now argues that by the unanswered question the State "managed to plant the idea that a person identified at the scene as 'Little Pie' was Manuel Bobe." The fact that someone had identified the defendant as "Little Pie" had already been established by Bloore's testimony without objection. Moreover, the fact that the defendant might have been known by another nickname is of no significance.

Holly McGuire testified that she originally told the police that she did not know anything. After that she talked to her friend Renee and told Renee "what really happened." The following then occurred:

"DEFENSE ATTORNEY: Objection. Prior inconsistent statement.

PROSECUTOR: I'll rephrase that.

THE COURT: Sustain the objection. She went back and spoke with her friend Renee."

McGuire then testified that after she talked with Renee, she went back and told the police what had happened. The defendant's attorney objected, and the judge allowed the answer to stand. Again, we find that no error occurred. McGuire was not permitted to testify to the contents of the conversation she had with Renee. (See *People v. Gacho* (1988), 122 Ill. 2d 221, 522 N.E.2d 1146.) In addition, McGuire's statement that she "told Renee what really happened" was not provoked by the prosecutor, and the defendant's attorney's objection was immediately sustained.

In closing argument, the prosecutor made several remarks which the defendant contends improperly implied that potential witnesses had been intimidated by the defendant or his fellow gang members:

> "PROSECUTOR: Now, there were three witnesses. Those three. I didn't have 50. I wish I did, but this is a gang case. We're not going to have 50.
>
> DEFENSE ATTORNEY: Object.
>
> PROSECUTOR: People seem to get a little nervous coming in and testifying in gang cases.
>
> THE COURT: I will let counsel make his argument.
>
> PROSECUTOR: The minute those shots were fired, people were barreling out of there. I am out of here. I didn't see nothing. I am out. I am gone. If you remember their witness said that they called the officer—first officer on the scene. He came there and everybody is going out the door. No one wants to be here. No one wants to come in court and say, yeah, that is the bad guy. The party emptied out, but there were some people who were courageous enough to come in here and tell you what they saw. A young, skinny, frail girl, Holly McGuire, and she got up there and she did her very best to tell you what she saw. She saw this co-defendant, Jason Gray, standing in the door."

■■ Holly McGuire testified, without objection, that when she was first questioned by the police she told them that she had not seen anything; she did so because she was too "scared" to tell the truth. She was asked what she was afraid of, and she said, "I don't know. I was afraid I was going to get hurt." Since her testimony was in the record, as was evidence of what the first officer on the scene found, the prosecutor had the right to comment on the evidence and to draw appropriate inferences from it. No error occurred in that part of the State's closing argument.

We cannot come to the same conclusion about another part of the State's argument. The prosecutor suggested that witnesses had been intimidated by the defendant's fellow gang members flashing their gang symbols in the police station:

> "PROSECUTOR: That is when it is his time to get off the dime and to put the bad guys in it because it is time to save the young lad, save myself now. I am off the ship. All of a sudden the bunny is not so cool anymore, right? We're not up there flipping the bunny anymore even though the guys in the lineup apparently were. Ask yourself why young Ignacio out there in the crowd, why he was putting—well, his friends were

putting up the symbols in the police station. Why represent in the police station? It is to intimidate witnesses.

DEFENSE ATTORNEY: He said he didn't know who it was.

THE COURT: I would sustain the objection.

PROSECUTOR: Someone in the lineup, whoever it may be, was throwing up the bunny. Why? To keep anybody who might be brave enough to come to court from doing so. That is the only reason, to keep that gang intimidation going, but it is time anyway to get myself out of it and put my buddies in. So what does he say in the statement? It was number one and number ten.

DEFENSE ATTORNEY: Object. There is no evidence that these are buddies.

THE COURT: I would sustain the objection. Ask the jury to disregard it."

In *People v. Brown* (1983), 113 Ill. App. 3d 625, 447 N.E.2d 1011, the court held that a prosecutor's repeated arguments that the defendant had intimidated witnesses and prevented them from testifying were without foundation and clearly calculated to prejudice the defendant in the eyes of the jury. Similarly, in this case, the prosecutor's remarks were not based upon the evidence. During cross-examination, Ignacio Miguel testified that "some lady" said that someone in the lineup was "representing," that is, making gang hand signals. Miguel denied that anyone was representing and specifically denied that the Two-Six "bunny" signal was made by anyone. Thus, the prosecutor's repeated remarks about someone "flipping the bunny" in the police station "to intimidate witnesses" were without foundation and were improper. The error is aggravated by the fact that the prosecutor ignored the ruling of the judge.

In *People v. Gonzalez* (1991), 142 Ill. 2d 481, 568 N.E.2d 864, the supreme court held that a prosecutor's similar remarks were improper but did not deny the defendant a fair trial. In *Gonzalez*, the prosecutor made three remarks, all of which were immediately objected to by defense counsel, and all of the objections were sustained. The prosecutor first said, "Well, let me tell you this. It took a lot of guts for Jose to get on that stand and face this man and say he did—." (142 Ill. 2d at 492.) Next, he remarked, "Maybe [the defendant] didn't think Jose Asia would be here. Maybe he didn't think he would testify." (142 Ill. 2d at 492.) Finally, he stated, "Based on the overwhelming evidence in this case, the fact that Jose had the guts to come in here and testify." (142 Ill. 2d at 492.) We think the facts of this case are closer to

*Gonzalez* than they are to *Brown.* In *Brown,* the court held that the evidence of the defendant's guilt was not overwhelming. In addition, there were other instances of prosecutorial misconduct in *Brown.* In the case before us, an eyewitness, who knew the defendant, identified him as being one of the persons in the doorway who had a gun in his hand. We repeat that that testimony was corroborated to some extent by Rahder and Holly McGuire. And again we emphasize that the identification was corroborated by the voluntary statement given by the defendant to the police and to an assistant State's Attorney. A trial judge is generally in the best position to determine any prejudicial effect of comments made during closing argument; consequently, his ruling will be upheld absent a clear abuse of discretion. (*Gonzalez,* 142 Ill. 2d at 494.) Under the circumstances, we cannot say that the judge abused his discretion.

For all these reasons, the judgment of the circuit court is affirmed.

Judgment affirmed.

RAKOWSKI and LaPORTA, JJ., concur.