THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
ANTHONY LASH, Defendant-Appellant.

First District (1st Division)   No. 1—91—2920

Opinion filed February 22, 1993.

Rita A. Fry, Public Defender, of Chicago (James N. Perlman, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Linda Woloshin, and Ann L. Benedek, Assistant State's Attorneys, of counsel), for the People.

JUSTICE O'CONNOR delivered the opinion of the court:

Following a jury trial, defendant Anthony Lash was convicted of the July 1989 shooting murder of James Towns (Ill. Rev. Stat. 1989, ch. 38, par. 9—1) and sentenced to 34 years' imprisonment. Defendant raises the following errors on appeal: (1) the circuit court erroneously denied his pretrial motion to suppress; (2) the court improperly allowed the State to inform the jury on multiple occasions that defendant had been arrested previously on another matter; (3) the court improperly admitted certain testimony demonstrating how the police were led to defendant as the assailant; (4) the court erred in admitting testimony from an assistant State's Attorney that "improper" confessions are suppressed at criminal trials where such testimony suggested that defendant's confession was proper in this case since it was admitted at trial; and (5) multiple instances of prosecutorial comment during closing argument denied him a fair trial. We affirm.

Defendant's guilt in this case was largely established through his own oral confession, although he denied making it, and the eyewitness testimony of Eugene Hammond, a neighbor of the deceased.

Defendant, age 16, stated in his confession that the victim, Towns, owed him $60 for some cocaine. At about 10:15 p.m. on July 2, 1989, he was parked in a brown station wagon with other individuals waiting for Towns to come out of his house. Defendant had taken two trips past Towns' house and noticed that his car windows were open. Defendant knew that Towns would be out to roll up the windows because it was an unsafe neighborhood. When Towns came out, defendant alighted from the station wagon with a gun and walked towards Towns. When defendant got within five to six feet of Towns,

Towns turned, faced defendant and began pleading for help. Defendant then fired four shots at Towns, who fell to the ground. Defendant ran away and returned to the waiting station wagon. He and the other persons then drove by the victim and to defendant's house. Defendant went into his house and hid the gun. Defendant later gave the gun to another individual, who sold it to yet another. The police were later able to obtain the gun, which the State introduced into evidence.

Hammond testified for the State that he lived four houses away from Towns on the same side of the street. At about 10 p.m. on July 2, 1989, he was in his front yard talking with a friend. As they talked, Hammond noticed a brown station wagon with approximately four people in it. It was the same car he had seen drive by earlier that same day. At about this time, Towns came out of his house, went to his car and rolled up its windows.

The station wagon stopped and defendant exited. Defendant then walked along the sidewalk in front of Hammond's yard, coming as close as 10 to 15 feet at one point. The streetlights were on, and Hammond saw defendant's face when he looked at Hammond and his friend. Towns was leaning against his car when he turned and saw defendant approaching. Towns began yelling for help, and defendant shot Towns from a close distance. Towns fell to the ground, and defendant ran away. About four minutes later, Hammond saw the same brown station wagon drive by the murder scene.

Hammond identified a photograph of defendant in court, which the police had shown him in August 1989. In September 1989, Hammond viewed a lineup at a police station. Hammond identified in court a photograph of the lineup and identified defendant in that picture.

Defendant denied at trial all involvement with Towns' murder and claimed the police fabricated his confession.

Defendant first contends on appeal that his confession was involuntary and should have been suppressed. We disagree.

The constitutional privilege against self-incrimination is applicable to juveniles (*In re Application of Gault* (1967), 387 U.S. 1, 18 L. Ed. 2d 527, 87 S. Ct. 1428), and the State bears the burden of demonstrating that a confession was voluntarily made. (*People v. Holcomb* (1989), 192 Ill. App. 3d 158, 170, 548 N.E.2d 613; *People v. Reed* (1984), 123 Ill. App. 3d 52, 59, 462 N.E.2d 512.) The trial court need be convinced only by a preponderance of the evidence that the statement was voluntary (*Holcomb*, 192 Ill. App. 3d at 170; *Reed*, 123 Ill. App. 3d at 59), and it is the province of the trial judge to resolve any

conflicts in the evidence and to determine the credibility of the witnesses. (*People v. Bobe* (1992), 227 Ill. App. 3d 681, 705, 592 N.E.2d 301, *appeal denied* (1992), 146 Ill. 2d 634, 602 N.E.2d 459; *People v. Brown* (1989), 182 Ill. App. 3d 1046, 1051, 538 N.E.2d 909.) An appellate court's review of the voluntariness question is limited to whether the trial court's finding is against the manifest weight of the evidence. *Holcomb*, 192 Ill. App. 3d at 170; *Reed*, 123 Ill. App. 3d at 59.

Assessing the voluntariness of a juvenile's confession requires great care. (*People v. Knox* (1989), 186 Ill. App. 3d 808, 542 N.E.2d 910, *appeal denied* (1989), 127 Ill. 2d 630, 545 N.E.2d 122.) However, statements made by juveniles are generally subjected to the same test as adult defendants. (*People v. Prude* (1977), 66 Ill. 2d 470, 363 N.E.2d 371, *cert. denied* (1977), 434 U.S. 930, 54 L. Ed. 2d 291, 98 S. Ct. 418.) The test is whether the statement was made freely, without compulsion or inducement of any sort, or whether defendant's will was overcome when he made the statement. (*People v. Prim* (1972), 53 Ill. 2d 62, 70, 289 N.E.2d 601, *cert. denied* (1973), 412 U.S. 918, 37 L. Ed. 2d 144, 93 S. Ct. 2731.) A court is to look to the totality of the relevant circumstances surrounding the making of the statement (*Prude*, 66 Ill. 2d at 475; *Prim*, 53 Ill. 2d at 70), which include: the existence of any promises, threats or physical coercions; whether the accused received his constitutional rights; the duration of the questioning; and the age, education and intelligence of the defendant. *People v. Martin* (1984), 102 Ill. 2d 412, 427, 466 N.E.2d 228, *cert. denied* (1984), 469 U.S. 935, 83 L. Ed. 2d 270, 105 S. Ct. 334.

In this case, Detective Kill of the Chicago police department testified for the State that on September 14, 1989, he was investigating the July 2, 1989, homicide of Towns. Kill arranged for defendant to be questioned regarding the murder. Defendant was residing on this date at the Audy Home, where he was being held as a suspect in an unrelated attempted murder. Kill was the detective on that case, too.

Prior to the interview, Kill attempted to contact defendant's parents. In a prior interrogation of defendant on July 19 regarding the attempted murder charge, defendant's stepfather was present during the interview. Kill knew that the stepfather worked until mid-afternoon as did defendant's mother. Kill did not have the stepfather's or mother's work number. Kill also knew that defendant was represented by counsel in the attempted murder case.

At 11 a.m., Kill interviewed defendant at Area 3 headquarters in an interview room. Kill reintroduced himself, and introduced youth officer Balcitis and Detective Fred McKinley. All three were present during the interview. Kill gave defendant his *Miranda* warnings from

a FOP handbook, and defendant indicated he understood each right. The rights given to defendant were the same ones which defendant received during a July 19 interview, when Kill interviewed defendant on the attempted murder charge.

Kill informed defendant that the nature of the offense allowed him to be charged as an adult. Defendant understood this and indicated that he wished to speak about the Towns murder. Defendant thereafter made the oral statement which was subsequently introduced at trial.

Kill testified that at no time did defendant ask to see a lawyer or that his parents be contacted. Defendant was never subjected to threats, coercion or intimidation at any time. The interview lasted 20 minutes. No attorney was present during the interview. Youth Officer Balcitis was only alone with defendant after he made his statement.

Detective McKinley of the Chicago police department, Area 3 violent crimes, testified for the State that on September 14, 1989, at about 9 a.m., he retrieved defendant from the Audy Home. McKinley did not ask any of the home's officials to accompany him to Area 3 or seek to interview defendant at the home. Defendant did not ask that his parents be contacted, and they were not contacted to McKinley's knowledge. McKinley knew that defendant was being represented by legal counsel regarding the attempted murder charge.

McKinley transported defendant in handcuffs alone from the Audy Home to Area 3 headquarters. A lineup was conducted when defendant arrived; Detectives Kill and McKinley and youth officer Balcitis were present for the lineup. Following the lineup, defendant was interviewed. The remainder of McKinley's testimony is substantially corroborative of Kill's testimony.

Chicago police officer Sharon Balcitis of the youth division testified for the State that she too participated in the lineup and interview at Area 3 headquarters on September 14, 1989. Although she was present to protect defendant and safeguard his interest, at no time did she speak with him prior to the interview.

Detective Kill introduced Balcitis to defendant as "the Youth Officer there on his behalf." Kill gave defendant his *Miranda* warnings from Kill's FOP book. Defendant indicated he understood those rights and that he wished to make a statement. Balcitis did not explain to defendant what those rights meant. Defendant at no time indicated that he wished to have an attorney present or that he wanted his parents contacted. Defendant at no time received threats, coercion or intimidation from anyone. Balcitis was alone with defendant following

the interview, but they did not speak. Balcitis' participation in the interview consisted only of observing defendant and the detectives.

Defendant testified at the suppression hearing that he resided at the Audy Home in September 1989 because of a pending attempted murder charge. A public defender represented him on that charge.

On September 14, 1989, he was summoned from his room to go to the interview. Detective McKinley handcuffed and escorted him to Area 3 headquarters for an interview. There were interview rooms at the Audy Home. Defendant asked McKinley if he could call his parents or a lawyer. McKinley replied that he could.

In the interview room, four or five officers were present. One of the officers started "asking me questions in force as if putting words in my mouth." Defendant explained that the officers were telling him what happened. Neither defendant's mother, father, nor lawyer ever appeared during the interview. Defendant was very frightened during the interview because he thought he would be beaten. Defendant never signed a statement and denied making any statement to the police whatsoever.

Defendant had been to Area 3 headquarters before and had been interviewed by Kill regarding the attempted murder charge. Defendant never received his *Miranda* warnings before the September interview although at trial he later testified he did. Defendant also testified at trial that Detective Kill pushed his head against the wall during the interview.

Following the evidence, the court found that defendant at no time requested an attorney; defendant received his rights; defendant was not physically abused; defendant had prior experience with custodial interrogations; and the interrogation lasted about a half hour. The court for these reasons found defendant's statement to be voluntary and, accordingly, denied his motion to suppress.

On appeal, defendant urges that Detective Kill arranged the timing of the interview so that it would occur while his parents worked. Also, while youth officer Balcitis was present during the interview, her presence was illusory, because she did *nothing* to protect his interests. Further, both Kill and McKinley knew that defendant had counsel for the attempted murder charge but conducted the interview anyway without even contacting his attorney. Defendant asserts that the above conduct evinces a police intent to minimize, not maximize, the protections afforded a minor under the Juvenile Court Act of 1987 (the Act) (see Ill. Rev. Stat. 1989, ch. 37, pars. 805—5, 805—6) (outlining duties of police upon taking minor into custody without warrant).

Defendant asserts that if the Act is to have any meaning, his confession should be suppressed.

We believe defendant is misplaced in asserting the premise that an incriminating statement must be suppressed when taken in violation of the Act. No sanctions for alleged police violations of sections 5—5 and 5—6 exist in the Act, and our cases have held that such violations do not make an incriminating statement *per se* inadmissible. Again, the test is the totality of the circumstances, with alleged violations of the Act being only material factors to consider in assessing the overall voluntariness of the confession. (See *People v. Steptore* (1972), 51 Ill. 2d 208, 281 N.E.2d 642; *People v. Zepeda* (1970), 47 Ill. 2d 23, 265 N.E.2d 647; *People v. Brown* (1992), 235 Ill. App. 3d 479, 601 N.E.2d 1190; *People v. Bobe* (1992), 227 Ill. App. 3d 681, 592 N.E.2d 301; *People v. Earnest* (1991), 224 Ill. App. 3d 90, 586 N.E.2d 449, *appeal denied* (1992), 144 Ill. 2d 637, 591 N.E.2d 25; *In re J.S.* (1984), 121 Ill. App. 3d 927, 460 N.E.2d 412; *In re Stiff* (1975), 32 Ill. App. 3d 971, 336 N.E.2d 619.) Of course, police run the risk of having a statement suppressed when violations of the Act occur. (See *People v. R.B.* (1992), 232 Ill. App. 3d 583, 597 N.E.2d 879; *In re J.O.* (1992), 231 Ill. App. 3d 853, 596 N.E.2d 1285; *People v. Brown* (1989), 182 Ill. App. 3d 1046, 538 N.E.2d 909; *People v. Knox* (1989), 186 Ill. App. 3d 808, 542 N.E.2d 910, *appeal denied* (1989), 127 Ill. 2d 630, 545 N.E.2d 122; *People v. McGhee* (1987), 154 Ill. App. 3d 232, 507 N.E.2d 33, *appeal denied* (1987), 116 Ill. 2d 570, 515 N.E.2d 120; *People v. Travis* (1984), 122 Ill. App. 3d 671, 462 N.E.2d 654.) As we have noted, these violations may make the difference in a close case. (*In re Stiff* (1975), 32 Ill. App. 3d 971, 978, 336 N.E.2d 619.) Thus, notwithstanding the absence of sanctions within the Act, the judicial sanction of suppression may nevertheless be imposed in the proper case.

Here, while the officers' testimony conflicted with defendant's, the manifest weight of the evidence supports the trial court's conclusion that defendant's oral confession was voluntary. Due to his past exposures to criminal proceedings, defendant was familiar with Detective Kill and interview procedures. A youth officer was present during the interview. No testimony existed that defendant was physically abused in any manner, save for defendant's own at trial, which is inconsistent with his testimony at the suppression hearing. Defendant received his rights and acknowledged understanding them. Defendant learned that he could be charged as an adult. The interview was short. Considering the evidence as a whole, the manifest weight of the evidence clearly supports the court's ruling that defend-

ant's confession was voluntary under the totality of the circumstances, notwithstanding the State's alleged noncompliance with the Act. We accordingly affirm the circuit court's ruling.

Defendant next contends on appeal that the admission of "mug shot" evidence denied him a fair trial. Prior to trial, defendant filed a successful motion *in limine* precluding the State from referring to his prior juvenile delinquency adjudications or his open charge of attempted murder. Defendant also moved that the jury not be allowed to see the array of photographs from which Eugene Hammond identified defendant. The court ruled that the jury would be allowed to see them only if they were requested.

During trial, Detective Kill was asked about the police investigation of the Towns murder. During the investigation, Kill utilized a series of five photographs to show witnesses for purposes of identifying the perpetrator. In response to the State's question, "What did those pictures show?" Kill stated: "mug shots, identification photographs taken by the Chicago Police Department of persons previously arrested." Defendant's objection to this comment was sustained and the jury was instructed to disregard it.

Later, during deliberations, the jury requested to see these photographs, and the court allowed them into the jury room. The record shows these photographs to depict front and side views of defendant and four others with placards across their chests. Defendant's placard bears the following: "2 CHGO PD YD 212051 25 Jan 88." The others' placards bear similar characters.

■ We agree initially with defendant that Kill improperly interjected other crimes evidence into trial when he testified that the photographs shown to eyewitnesses were "mug shots" of "persons previously arrested." The trial court had ruled that "other crimes" evidence would not be permitted and that the "mug shots" themselves would not be exhibited to the jury unless they were specifically requested. The State's question specifically sought to elicit the response Kill in fact gave and, thus, the State violated the court's prior ruling as well as known principles of evidence. Kill's testimony, however, is moot if we can determine that the admission of the five mug shots was not error or, if so, not prejudicial error. The same can be said for defendant's similar, "other crimes" allegation of error, that Kill erroneously testified at trial that defendant "knew him."

Where identification is a material issue at trial, testimony relating to the use of mug shots in an investigation may be introduced to show how a defendant was initially linked to the commission of an offense. (*People v. Arman* (1989), 131 Ill. 2d 115, 123, 545 N.E.2d 658, *cert.*

*denied* (1990), 494 U.S. 1018, 108 L. Ed. 2d 499, 110 S. Ct. 1324.) The admissibility of such evidence is not without limits, however. Mug shot evidence tending to inform the jury of a defendant's commission of other, unrelated criminal acts should not be admitted. (*Arman*, 131 Ill. 2d at 123.) Even where, however, the trial court erroneously admits mug shot evidence suggesting the defendant's involvement in unrelated offenses, reversal is not automatically warranted. (*Arman*, 131 Ill. 2d at 124.) When the competent evidence in the record establishes the defendant's guilt beyond a reasonable doubt and it can be concluded that a retrial without the erroneous admission of the challenged evidence would produce no different result, the conviction may be affirmed. *Arman*, 131 Ill. 2d at 124.

In this case, the jury received the mug shots only after it had specifically requested them. Identification was a contested issue, with defendant attacking the State's case by arguing that he did not do it, that he had been wrongly identified and that his confession was fabricated. Admission of defendant's mug shot, therefore, was clearly relevant to prove a material issue, although it also revealed defendant's prior involvement with the law. However, because any prejudice resulting from the photographs' admission was outweighed by their probative value for identification purposes, any error in admitting the mug shot was harmless beyond a reasonable doubt. (Accord *People v. Wheeler* (1979), 71 Ill. App. 3d 91, 97-98, 388 N.E.2d 1284; see also *People v. Arman* (1988), 171 Ill. App. 3d 232, 242, 524 N.E.2d 1195 (Freeman, J., dissenting).) As our supreme court has stated:

> "[W]e especially note that defendant's allegation of prejudice is somewhat speculative. To hold that this error is reversible would require us to presume that the jury recognized the arrest date for what it was, realized that arrest date preceded the date of the offenses with which defendant was charged, and then adjudicated defendant's guilt on the basis of this prior arrest rather than the evidence produced at trial. We do not believe that justice requires that this course be taken." (*People v. Warmack* (1980), 83 Ill. 2d 112, 129, 413 N.E.2d 1254.)

Defendant's argument is accordingly rejected.

Defendant's third allegation involves the testimony of Assistant State's Attorney John Muldoon. Muldoon testified for the State that he was an assistant State's Attorney serving as a supervisor in the felony review unit in September 1989. On September 14, 1989, Assistant State's Attorney Nancy Donahoe was assigned to defendant's case. Donahoe was instructed that she was to have no contact with defendant because he "was being represented in a different matter."

Donahoe was so instructed because the state of the law regarding the interrelation between a defendant's fifth and sixth amendment rights was unclear at the time of defendant's interview.

On cross-examination, defense counsel asked Muldoon whether the reason why Donahoe could not speak with defendant also applied to Detective Kill as well. Muldoon responded affirmatively. During the redirect which followed, Muldoon agreed with the State's assertion that "improper" statements are not allowed into evidence at trial. Later, during closing argument, the State referred the jury to this testimony, stating: "You also know, ladies and gentlemen, that if confessions are improper, they're not put in front of a jury." Defendant's objection was sustained and the jury was instructed to disregard the comment.

On appeal, defendant admits that his cross-examination of Detective Kill "opened the door" to the State calling and questioning Muldoon. In that cross-examination, defense counsel attempted to convey to the jury through questioning the idea that defendant gave no confession whatsoever because his oral statement was never reduced to writing as in the usual criminal case. Nevertheless, defendant contends that the court erred by not limiting Muldoon's testimony to informing the jury only that a "policy decision of the Office" motivated the State from taking a written statement. Defendant asserts that Muldoon's testimony gave the jury yet another opportunity to hear that defendant had been previously arrested. Defendant asserts further error with respect to the State's redirect, which defendant claims gave an official stamp of approval to his admitted confession since, as Muldoon testified, only "proper" confessions are heard by the jury.

■ We reject defendant's allegations of error. A defendant may not interject an issue into his case and then contend that the bringing of it to the attention of the jury was erroneous. (*People v. George* (1971), 49 Ill. 2d 372, 378, 274 N.E.2d 26.) Muldoon's testimony was unfortunate, but fault rests with defense counsel, not the State. It was counsel who questioned Detective Kill repeatedly about why defendant's confession was not reduced to writing when, in the typical case, such usually occurs. Counsel's questioning left the jury with the impression that the police had done something improper when, to the contrary, they were taking measures to assure that they did not violate defendant's rights. As Muldoon indicated, at the time of defendant's interview, a question existed as to whether a suspect could be questioned regarding one crime when he was being represented by counsel on another, pending criminal matter. The State limited Muldoon's testimony in such a way that defense counsel's innu-

endo of State impropriety was addressed without informing the jury what earlier crime defendant allegedly committed. Accordingly, we find that any prejudice defendant suffered from Muldoon's "other crimes" testimony was self-inflicted. Further, given that the jury heard only that defendant was being represented in another matter, any prejudice suffered is too minimal to require reversal.

Relative to Muldoon's redirect testimony, defendant again invited any prejudice he suffered. Defendant asked Muldoon whether Kill's meeting with defendant was similarly improper. Muldoon believed it was, but since it had already occurred, there was nothing the State's Attorney's office could do. Defendant's final question asked Muldoon whether Kill ever should have spoken with defendant. The State's objection was sustained. On redirect, the State elicited the answer to which defendant now objects, namely, that confessions which are somehow improper are suppressed.

We believe that the principle of *George* stated above applies with equal force to Muldoon's redirect testimony. Defendant invited it. Moreover, we do not believe that Muldoon's testimony constituted a stamp of approval of defendant's confession. The jury was subsequently instructed with Illinois Pattern Jury Instructions, Criminal, No. 3.06—3.07 (3d ed. 1992), which instructed the jurors that it was *their* role to determine whether defendant in fact gave a statement and what weight to give it based on the totality of the circumstances. Again, under the circumstances, any prejudice defendant incurred was invited by counsel's tactics, which we will not second guess. Further, we believe that any such prejudice was minimal.

Defendant next contends that the State introduced impermissible hearsay testimony in showing the jury how he came to be arrested in this case. We disagree.

Kill testified that around July 29, 1989, Area 3 headquarters received a handwritten letter with two newspaper clippings dated the 5th and 20th of July. One of the clippings involved the Towns murder. Kill then contacted Mrs. Dawson at a public administration building. This conversation led Kill to Mrs. Gayles, with whom Kill also spoke. Neither Dawson nor Gayles testified at trial.

Near the end of August, Kill received a telephone call from an unidentified caller. Kill then proceeded to Joe Davenport's home, about a block away from where Towns was killed. Davenport and Kill talked about a gun, but Kill did not obtain one. Kill then proceeded to Lorrell McCrary's house, located in the same area as the Towns murder. Kill obtained from McCrary on August 29, 1989, a .38-caliber snubnose revolver. Kill identified the gun in court.

Joseph Davenport testified that he was 18 years old and living within a short distance of where the murder occurred. Davenport knew Anthony Mitchell as well as defendant. In July 1989, Mitchell came by Davenport's house and gave him a loaded revolver. Davenport refused the gun, and Mitchell left. About a month later, the police came by asking Davenport about a gun. Davenport gave the police the name of who might have the gun. Davenport made a tentative in-court identification of the gun which Mitchell showed him that day. In defendant's oral confession, he stated that he gave the gun used to kill Towns to Jesse Mitchell, who later sold it to McCrary. Neither Mitchell nor McCrary testified at trial.

■ A review of the above testimony shows that neither Kill nor any other witness disclosed the substance of their conversations. Rather, the witnesses testified only to events and the occurrence of conversations. The fact that a conversation occurred, as compared to what was said during the conversation, is not hearsay. As our supreme court recently reiterated:

"It is undisputed that an officer may testify to his investigatory procedures, including the existence of conversations, without violating the hearsay rule. This is true even if a logical inference may be drawn that the officer took subsequent steps as a result of the substance of that conversation." *People v. Jones* (1992), 153 Ill. 2d 155, 159-60, citing *People v. Gacho* (1988), 122 Ill. 2d 221, 522 N.E.2d 1146.

We conclude that the State's relation to the jury of how defendant became a suspect and how the police came to find the gun used in the shooting was not hearsay. The cases defendant cites to support his position are all distinguishable as, in each of the cases cited, the content of the conversation was revealed. Again, such did not occur here.

Defendant finally contends that prosecutorial misconduct during closing argument denied him a fair trial. The first line of objectionable comments concerns the State's various assertions that witnesses were afraid to testify. During the State's initial close, the prosecutor stated, in reference to Eugene Hammond, that he was "the only person who was willing to come in here to testify to what he saw."

The next such comment occurred during the State's rebuttal. The State discussed generally that the evidence it presents in court turns in part on "the courage of individuals to come forward and tell what they saw and the fear of other people who don't want to do that." The State then referred the jury to the police officers on the scene who testified at trial that only a few people who witnessed the murder wanted to give their names.

The next similar comment occurred in response to defense argument that the persons whom the police contacted to obtain defendant's name as the perpetrator did not come into court to testify. Again, the prosecutor referred the jury to the officers' testimony that not everyone wanted to give his or her name. The State then commented: "I'm not suggesting at all that anybody else would identify him or is willing to identify him. I'm suggesting to you that we can't get the whole story all the time because people are afraid, because people don't want to become involved."

The final alleged improper comment of this nature is based on the State's argument that: "I wish we had more evidence to give you. I wish we had more eyewitness. That's not in our control. Some of it is in his control, some of it is in the minds and the fears of the people on the street."

Relying on *People v. Mullen* (1990), 141 Ill. 2d 394, 566 N.E.2d 222, defendant contends the above comments were egregious error. In *Mullen*, the court stated that "[p]rosecutorial comments which suggest that witnesses were afraid to testify because defendant had threatened or intimidated them, when not based upon any evidence in the record *** are highly prejudicial and inflammatory." (*Mullen*, 141 Ill. 2d at 405.) No evidence in *Mullen* existed that defendant in any way threatened or intimidated any witness. The comment in question in *Mullen* was that a witness feared testifying because he feared being shot in the back. The court held such comment to be plain error.

■ In this case, all but the prosecutor's final comment were predicated on competent evidence. Chicago police officer Charles Banks testified at trial "there were other people [at the scene] that were giving their opinions of what had happened, but they didn't want no part, they didn't want, you know, to be identified." Under *Mullen*, comments that individuals feared coming forward are proper where they are based on the evidence.

As for the final comment, we agree it was improper for the State to suggest that defendant had "some" control of who testified in this case. While testimony existed that defendant alighted from a station wagon containing several other individuals, no testimony existed that defendant controlled these individuals. We cannot say, however, that this comment requires defendant's conviction to be reversed.

The next set of alleged improper comments involves the State's comments that defendant was sent out by others to commit this crime. Defendant cites four such comments and claims as to each that no evidence existed to show that he acted on the behalf of others in committing the crime.

■ We find the comments to be proper or, if improper, harmless. The context of the argument was the State attempting to give reason to a senseless act. As noted, evidence existed that defendant did not act alone. Moreover, defendant's youth supplies the valid argument that others possibly pressured him into killing. Finally, it is worth noting that the State never mentioned gang involvement whatsoever. The murder was drug related, and the State's reference to the involvement of others relayed nothing more than the problems associated with society's rampant drug problems.

The next comment to which we are directed is the rebuttal comment that "[t]hey can't have it both ways, ladies and gentlemen. God gave us one mouth, sometimes we talk out of both sides of it."

■ We find the comment proper. Defendant called Detective McKinley to establish that Eugene Hughes gave inconsistent height descriptions of the perpetrator. Defense counsel then attacked him in closing for playing a role in fabricating defendant's oral confession.

We believe the State was entitled to argue that defendant cannot both attack and praise McKinley simultaneously. This was not a personal attack against either defendant or his counsel and, thus, defendant's cases involving such personal attacks are distinguishable.

The final comments involved defendant's claim that the State shifted the burden of proof. All occurred in the State's rebuttal argument.

The first such comment pertains to the State characterizing defendant's attack on Eugene Hammond as suggesting he was lying on the witness stand. The second comment was that if defendant was correct in asserting that he never confessed, the jury would have to believe that Detective McKinley was out to frame "an innocent kid for no reason." The third and fourth comments concern the State's attack of defendant's theory of defense as unreasonable while claiming that its theory was more reasonable.

■ We find that the complained-of comments were either proper or, if improper, harmless. The State is entitled to respond to defendant's argument which attacks its case and witnesses. Clearly, whether defendant's theory of defense is reasonable in light of the evidence produced is within the scope of proper rebuttal comment. The comments in question involve nothing more than this.

*People v. Wilson* (1990), 199 Ill. App. 3d 792, 557 N.E.2d 571, and *People v. Ridley* (1990), 199 Ill. App. 3d 487, 557 N.E.2d 378, relied upon by defendant, are distinguishable. In each of these cases, the complained-of comments concerned the State telling the jury that to believe defendant's witnesses each of the State's witnesses must be

254

lying. This type of comment did not occur here. Never did the State tell the jury what it must find to reach a certain verdict. Finally, the jury was instructed regarding the State's burden of proof and the elements of murder. For the foregoing reasons, we reject defendant's arguments that the State's conduct during closing argument denied him a fair trial.

The judgment of the circuit court of Cook County is affirmed.

Affirmed.

MANNING, P.J., and CAMPBELL, J., concur.