THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RHONDA F., Defendant-Appellant.

First District (5th Division)   No. 1—95—2597

Opinion filed June 20, 1997.

Rita A. Fry, Public Defender, of Chicago (Alison Edwards, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Peter Fischer, James Fitzgerald, Veronica Calderon, and Jon Walters, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE HARTMAN delivered the opinion of the court:

Defendant, Rhonda F., age 15, was found guilty by a jury of second-degree murder. The circuit court adjudged defendant to be a ward of the court and sentenced her to an indeterminate term in custody of the Juvenile Department of Corrections. Defendant appeals, claiming error in: (1) the circuit court's finding that her confession was voluntary; (2) the exclusion of evidence of the decedent's violent and aggressive character; (3) the exclusion of evidence of the decedent's prior arrests for child endangerment and possession of a controlled substance with intent to deliver; (4) the State's cross-examination of defendant and a defense witness; (5) the State's comments during closing argument; and (6) sentencing. Issue (1) will be considered in this opinion; issues (2) through (6) will be determined in a separate Supreme Court Rule 23 order disseminated contemporaneously with this opinion. For reasons that follow, and those contained in our separate Rule 23 order, we affirm defendant's conviction, reverse her sentence, and remand this case to the circuit court for resentencing.

On March 17, 1993, defendant fatally shot her mother, Beatrice, once in the chest. Prior to trial, defendant moved to suppress statements, claiming that, due to her emotional state, she was unable to understand *Miranda* warnings and was questioned although no guardian was present.

At the hearing on defendant's motion to suppress, Detective

James Cassidy testified he arrived at the scene of the shooting at 1:30 p.m. and saw defendant, crying, sitting in the back seat of a squad car. Defendant was taken to the police station, but she was not a suspect at the time and was not under arrest.

Detective Cassidy arrived at the police station between 3 p.m. and 3:30 p.m., after speaking to several people in defendant's neighborhood. Cassidy and Detective William Moser began to speak with defendant, who was considered a witness and was free to leave. Fifteen minutes into their conversation, Cassidy advised defendant of her constitutional rights from a preprinted card because she made a statement that conflicted with statements made by other people. Cassidy then told defendant that she could "possibly be charged as an adult" because a murder had been committed and considering her age. Cassidy asked defendant if she wanted the police to contact her father. Defendant shook her head to indicate "no." Moser left the room to speak with other witnesses and Cassidy questioned defendant. Moser subsequently gave Cassidy a gun he had received from one of defendant's family members. Defendant identified the gun as the one she used to shoot Beatrice. A photograph was taken of the gun. After 30 to 45 minutes of questioning, youth officer Terrell entered the interview room, introduced himself to defendant, and gave her *Miranda* advisements. Cassidy left the room and Terrell sat with defendant for the next hour and one-half.

Detective Cassidy reentered the room when assistant State's Attorney (ASA) Ted Johnson arrived at 6:30 p.m. Youth officer Steven Terrell remained present. Johnson advised defendant of her *Miranda* rights and told her she would be charged as an adult. After speaking with defendant for 15 minutes, Johnson and Cassidy left the room to request a court reporter, but later reentered the room and spoke with defendant for 10 minutes until the court reporter arrived. Defendant was moved into a larger room and her responses to Johnson's questions were transcribed by the court reporter. Defendant then read and signed the statement. Cassidy, Johnson and Terrell also signed the statement.

According to Detective Cassidy, defendant was never promised that she could go home if she signed the statement nor told that her grandmother was waiting for her at the police station. Nor did he tell defendant the story of a boy who killed his father in self-defense. Defendant did not cry at the police station; she did not become upset when shown the gun. Defendant was never handcuffed, and the door to the interview room remained open during the entire time she was inside. Defendant did not ask to speak to her grandmother or aunt. Defendant's grandmother, who was at the police station for a short

time, was not allowed to see defendant "[b]ecause of her hostility towards defendant."

Detective William Moser testified he was present for defendant's initial conversation with Detective Cassidy at 3:45 p.m. Cassidy advised defendant of her rights from a preprinted card. Defendant shook her head "no" when asked if she wanted her father present. Moser left the room to secure a youth officer for defendant but was unable to obtain one immediately because a shift change was occurring.

Detective Moser received a gun from one of defendant's family members. Moser never promised defendant she could go home or that she could talk with her grandmother if she signed a statement. Moser did not tell defendant a story of a boy who killed his father in self-defense. At approximately 6 p.m. at the police station, Moser spoke with defendant's grandmother, who, along with other family members, was "highly upset" about the shooting. Defendant's grandmother and family members were not permitted to see defendant because the police believed they might physically harm her.

Youth officer Steven Terrell testified that, after arriving at the station, he was assigned to defendant's case and first saw defendant at approximately 5 p.m. Terrell informed defendant who he was, gave her *Miranda* warnings from a preprinted form, and told her she would be charged as an adult. Defendant understood her rights. Defendant was not hungry but asked for some water, which Terrell gave her. Defendant shook her head "no" when asked if she wanted her father present. ASA Johnson subsequently arrived and informed defendant who he was and advised her of her rights. During her statement, Terrell showed defendant a photograph of the gun. After defendant gave her statement, Johnson read over the statement, signed each page and handed it to defendant, who read it and signed each page. Terrell and Cassidy also signed each page of the statement. Defendant was responsive and understood Terrell's questions. Terrell never told defendant she could go home if she signed the statement nor did he tell her a story of a boy who shot his father in self-defense.

ASA Ted Johnson testified he advised defendant of her rights, which she understood and agreed to waive. Defendant understood that Johnson was a prosecutor. After a 15-minute conversation, defendant agreed to give a statement before a court reporter, which started at approximately 7:30 p.m. and lasted one hour. Defendant was responsive to Johnson's questions. The court reporter transcribed defendant's statement, which Johnson and defendant read over, making corrections where necessary. Johnson, Cassidy, Terrell and defen-

dant signed each page of the statement and initialed the one correction made. Johnson twice showed defendant a photograph of the gun for identification purposes. Johnson never promised defendant she could go home after signing the statement nor told her that her grandmother was waiting for her downstairs. Johnson did not tell defendant about a boy who shot his father in self-defense. Defendant never requested to speak with her grandmother or any other family member. The State rested.

Beauty Donald, defendant's grandmother and Beatrice's mother, testified that on March 17, 1993, she went to the morgue after learning of Beatrice's death. Donald then went to Beatrice's house, where two detectives told her defendant had been taken to the police station. Donald arrived at the police station between 4 p.m. and 5 p.m. and asked to see defendant, who was being held for questioning. Donald's two or three requests to see defendant were denied. A police officer told Donald to go home because her son had been killed nine months before and it was "too much" for her. Donald waited 30 to 40 minutes before leaving. Donald telephoned the police station several times that evening and was told she could not see defendant. On cross-examination, Donald, who was accompanied to the police station by her daughter, Latonya, and two nieces, did not know defendant was charged with the shooting until the next day. All the women were upset and crying, but they were not "hollering."

Defendant testified the police officers put her in the back of a squad car at approximately 1:30 p.m. She tried to open the door, but the police would not let her out nor would they let Aunt Latonya enter the squad car. Defendant, who was crying, sat in the squad car for a couple of hours. Defendant asked to speak with her grandmother and aunt. Defendant was read her rights and then taken to a small room at the police station where she was questioned by Detective Cassidy for "some hours." He did not read defendant her rights. Detective Moser was also in the room and kept "making smart remarks" to defendant. Defendant was crying and asked about Beatrice. Between 6 p.m. and 7 p.m., Moser told defendant that Beatrice was dead. Defendant jumped up and attempted to leave, but the detectives would not let her. A detective told defendant that her grandmother was downstairs, but he denied defendant's several requests to see her. Defendant was told she had to finish her statement before she could see her grandmother. One of the detectives tried to persuade defendant to make statements by telling her of a boy who shot his father in self-defense. Defendant was never asked if she wanted to speak with her father. She did not request to speak to him. Defendant was with the police three or four hours before youth

officer Terrell entered the room. When shown the gun and the photograph of it several times, defendant was upset and did not want to see it anymore.

On cross-examination, defendant stated she asked the police officer who eventually took her to the police station to let her out of the squad car, but he would not let her leave. She was not read her rights until she arrived at the police station, where she was placed in a small room. The door was closed, but defendant did not know if it was locked. After a few minutes, Detective Cassidy entered and spoke with defendant, leaving the door open. Cassidy asked defendant what had happened and she told him to speak with Beatrice. Detective Moser entered the interview room, sat and listened. Moser became upset when defendant would not talk and exited and reentered the room several times. Cassidy read defendant her rights, but defendant could not remember exactly what he said nor did she understand the *Miranda* warnings: she did not understand that she did not have to say anything. Cassidy left and returned thereafter with ASA Johnson. Youth officer Terrell did not arrive until after Johnson left. Defendant did not know what a youth officer was at the time of her questioning. Terrell asked defendant what school she attended, how old she was, and where her father was located. Defendant did not say anything. Terrell did not ask defendant if she wanted her father present, provide *Miranda* warnings, or tell defendant that she could be charged as an adult. After she refused to speak with Terrell, he just sat there.

Defendant stated that when ASA Johnson and Detective Cassidy returned, Johnson told her he was a prosecutor and did not represent her. Defendant did not understand who Johnson was and stated she "wasn't listening to what they [were] saying." She "just wanted to go home." Johnson did not read defendant her rights until just before the court reporter arrived. Johnson told defendant she had to make a statement and he and Cassidy stated that she could see her grandmother and go home after making a statement. Johnson read defendant her rights a second time when she was making her statement.

When Detective Cassidy showed defendant the gun, she pushed it away and did not say anything. ASA Johnson made defendant look at photographs of the gun against her wishes. She never identified the gun for Johnson but acknowledged doing so in her statement. Defendant did not read her statement before signing it. After defendant signed it, Johnson tried to read it to her, but she stood up to leave. Johnson told her to wait and again began reading the statement, but defendant asked to leave and Johnson then left. Defendant did not

initial the statement. She did not know what it meant to be tried as an adult and she was never told that she could be tried as an adult. Defendant was very tired during the questioning and wanted to go home.

In rebuttal, police officer Mark Parus testified that, a few minutes after he arrived at the scene of the shooting, defendant exited her house and was surrounded by a large group of people. Defendant accepted a police officer's invitation to sit inside a squad car. Defendant's aunt, Latonya, asked to speak with defendant and Parus directed her to the squad car. Aunt Latonya opened the door and spoke with defendant for a few minutes before leaving with defendant's grandmother. Defendant did not ask to speak with anyone nor did she ask to exit the squad car.

In ruling on defendant's motion to suppress, the court stated that the issue involved whether defendant, "at age 16," knowingly, intelligently and voluntarily waived her rights. The court noted that, in her statement, defendant acknowledged being treated well, was not threatened or promised anything, and stated that she gave her statement voluntarily. The court believed that the police officers could have interpreted the grandmother's upset condition as anger toward defendant and denied defendant's motion to suppress, finding that defendant knowingly and intelligently waived her rights and freely and voluntarily gave her statement.

Defendant contends the circuit court's finding that her confession was voluntary was manifestly erroneous where police failed to make a good-faith effort to secure the presence of a concerned adult, refused to permit defendant's grandmother to see her, and gave defendant incomplete and misleading *Miranda* warnings.

■ Juveniles, as well as adults, enjoy the constitutional privilege against self-incrimination, and the State must demonstrate, by a preponderance of the evidence, that a confession was voluntarily made. *People v. Lash*, 252 Ill. App. 3d 239, 242, 624 N.E.2d 1129 (1993). On review, a court must determine whether the circuit court's finding of voluntariness is against the manifest weight of the evidence. *People v. Davis*, 97 Ill. 2d 1, 20, 452 N.E.2d 525 (1983). A court must consider the totality of the relevant circumstances surrounding the making of the statement (*People v. Prude*, 66 Ill. 2d 470, 475, 363 N.E.2d 371 (1977)), including whether any promises or threats were made, whether defendant was instructed as to her constitutional rights, the duration of the questioning, and the age, education and intelligence of defendant. *Lash*, 252 Ill. App. 3d at 243.

■ Section 3—8(2) of the Juvenile Court Act of 1987 (Act) provides:
"A law enforcement officer who takes a minor into custody

without a warrant *** shall, if the minor is not released, immediately make a reasonable attempt to notify the parent or other person legally responsible for the minor's care or the person with whom the minor resides that the minor has been taken into custody and where the minor is being held; and the law enforcement officer shall without unnecessary delay take the minor to the nearest juvenile police officer designated for such purposes in the county of venue or shall surrender the minor to a juvenile police officer in the city or village where the offense is alleged to have been committed." 705 ILCS 405/3—8(2) (West 1992).

Defendant claims the police violated the Act, relying upon *People v. Montanez*, 273 Ill. App. 3d 844, 652 N.E.2d 1271 (1995). In *Montanez*, defendant was arrested at 9 p.m. and taken to a police interview room, where she was informed "of her *Miranda* rights and that she could 'possibly' be charged as an adult." 273 Ill. App. 3d at 845. A youth officer was requested and a police car was sent to locate defendant's family. Unknown to a detective, defendant's mother was at the police station and was not allowed to see defendant. Two police officers arrived at defendant's home at 10 p.m. and first told defendant's mother that defendant was in protective custody; later, they stated that defendant was involved in a murder. 273 Ill. App. 3d at 846. Defendant's mother was told she could not see defendant at that time and the police would contact her when she could see her daughter. At 10 p.m., defendant was questioned for 20 or 30 minutes. A youth officer did not arrive until 12:30 a.m. the next day and was present for subsequent questioning at 1:15 a.m., 5:15 a.m., and 6:15 a.m. Defendant's mother, who had not heard from the police, went to the police station at 2 a.m. She was told to wait, then to " 'get the hell out' " of the station. Defendant's mother continued to ask to see her daughter every hour after that and was finally allowed to see her at 8:30 a.m. The *Montanez* court found defendant's confession involuntary where she was questioned prior to seeing either a youth officer or her mother, who was present at the police station during the time she was being questioned. 273 Ill. App. 3d at 849-55. The court noted that "not only was defendant interrogated before having an opportunity to confer with a concerned adult but, worse, any opportunity to do so was effectively frustrated by police." 273 Ill. App. 3d at 854.

▉ In the present case, defendant claims she similarly was questioned in the absence of a concerned adult. The evidence adduced at the suppression hearing was sufficient to permit the circuit court to believe the following evidence. Defendant was not brought into the police station under arrest, but as a witness. Initially, defen-

dant had accepted a police officer's invitation to escape the crowd and sit in a squad car. Defendant then agreed to go to the police station to speak with Detective Cassidy. Fifteen minutes into their conversation, defendant made a statement that was inconsistent with Cassidy's information. Defendant then was given *Miranda* warnings, and Detective Moser left immediately to secure a youth officer for defendant. Defendant claims she was interrogated without a concerned adult present, but defendant was not under arrest when she arrived at the police station and there is no showing she was under arrest even after *Miranda* advisement. See *People v. Barlow*, 273 Ill. App. 3d 943, 949, 654 N.E.2d 223 (1995), citing *People v. Williams*, 164 Ill. 2d 1, 13, 645 N.E.2d 844 (1994); *People v. Armstrong*, 244 Ill. App. 3d 545, 553, 614 N.E.2d 427 (1993). On this fact alone, the present case is distinguishable from *Montanez*.

*Montanez*, however, also involved extreme circumstances supporting a finding of involuntariness which are absent here. Unlike *Montanez*, defendant here was not arrested, taken to the police station, and interrogated several times throughout the middle of the night. Further, defendant's guardian was not prevented from seeing her: her mother was dead and she did not want the detectives to contact her father. Although the presence or absence of a parent is a factor to consider in determining the voluntariness of a confession, there is no *per se* rule that a parent or guardian be present. *People v. Gardner*, 282 Ill. App. 3d 209, 218, 668 N.E.2d 125 (1996); *People v. Bobe*, 227 Ill. App. 3d 681, 703, 592 N.E.2d 301 (1992). As soon as defendant made a statement inconsistent with other people's statements, the detectives advised her of her *Miranda* rights and attempted to obtain a youth officer. A youth officer was not located immediately because a shift change was occurring. These circumstances lack, entirely, the extreme and pernicious overreaching of *Montanez*.

Defendant here analogizes the police detectives' refusal to permit her grandmother to see her to the police obstruction in *Montanez*. Beauty Donald's testimony conflicted with Detective Moser's testimony. Donald, who was at the police station for 30 to 40 minutes, stated she arrived there between 4 p.m. and 5 p.m. Moser spoke with Donald at 6 p.m. It is the circuit court's province to resolve conflicts in the evidence and determine the credibility of the witnesses. *Lash*, 252 Ill. App. 3d at 242-43. Reading Donald's and Moser's testimony together, Donald arrived at the police station sometime after 5 p.m. By this time, however, youth officer Terrell was already meeting with defendant. *Cf. Montanez*, 273 Ill. App. 3d at 849-55. Defendant, moreover, does not assert that her grandmother was a "person legally

responsible" for her care. 705 ILCS 405/3—8(2) (West 1992). Unlike *Montanez*, therefore, defendant's parent or guardian was not prevented from seeing her. Additionally, the police detectives' refusal to permit Donald and other family members to see defendant was not without reason: the family members were "highly upset" and the detectives believed they might physically harm defendant. Donald acknowledged that she was upset at the police station but stated she was not "hollering."

Defendant next contends the evidence shows that the police made no effort to contact her father. Defendant was asked by Detectives Cassidy and Moser and youth officer Terrell whether she wanted them to contact her father. Defendant shook her head "no." Defendant's mother was dead. See 705 ILCS 405/3—8(2) (West 1992). The detectives' failure to make other efforts to contact defendant's father and thereby comply with section 3—8(2) of the Act is one factor to consider in determining whether defendant's confession was voluntary. See *People v. Denton*, 256 Ill. App. 3d 403, 405, 628 N.E.2d 900 (1993); 705 ILCS 405/3—8(2) (West 1992).

Defendant next asserts this court should also consider the fact that she was a 15-year-old and the circuit court stated that she was a 16-year-old. On the day of the shooting, defendant was four months shy of her sixteenth birthday. Although the court misstated defendant's age, her age is one factor to consider in deciding whether her confession was voluntary (see *Lash*, 252 Ill. App. 3d at 243), and the court's misstatement is not as detrimental or inaccurate as defendant would have this court conclude.

Defendant also maintains that she was not properly advised of her rights because the *Miranda* warnings given were misleading and incomplete. Defendant claims that ASA Johnson's testimony revealed that he gave incomplete *Miranda* warnings upon first interviewing defendant and she was inappropriately informed she "could" be tried as an adult although Illinois law requires a 15-year-old charged with first-degree murder be tried as an adult. 705 ILCS 405/5—4(6)(a) (West 1992). Although ASA Johnson did not repeat all the *Miranda* warnings at the hearing on defendant's motion to suppress, defendant ignores the testimony of Detective Cassidy and youth officer Terrell that they gave her *Miranda* warnings from preprinted cards. Defendant does not complain of the *Miranda* warnings prior to her statement to the court reporter. Defendant's argument is based, therefore, upon the third time she received *Miranda* advisement that day. Defendant's own testimony, however, was contradictory as to when she first received *Miranda* warnings: she testified she received them while in the police car, but then stated on cross-examination

that she was not given *Miranda* warnings until arriving at the police station. The credibility of the witnesses is within the province of the circuit court to determine (*Lash*, 252 Ill. App. 3d at 242-43), and the evidence does not support defendant's contention here.

■ Defendant next argues that the detectives and ASA improperly told her she "could" or "could possibly" be charged as an adult, leading her to believe that the police and ASA had the option of charging her either as an adult or a juvenile depending on her level of cooperation. ASA Johnson testified that when he arrived at the police station, he advised defendant she could be tried as an adult due to her age and "the type of investigation" they were conducting. Defendant asserts that she gave five different accounts to the police and, after the final interview with the ASA, admitted to shooting her mother. This evidence, however, was not adduced until trial. Notwithstanding defendant's failure to adduce this evidence at the pretrial hearing, the fact that defendant gave five different statements demonstrates that the ASA did not know what crime defendant would be charged with committing. The investigation was still proceeding and defendant was initially brought in as a witness. See generally *People v. Prude*, 66 Ill. 2d 470, 475-76, 363 N.E.2d 371 (1977). Defendant contends the use of the word "could" here was misleading and motivated her to cooperate. Defendant's argument proves too much because her contention, if accepted, would require law enforcement to predict the outcome of an investigation in the midst of questioning. Defendant, moreover, overlooks youth officer Terrell's testimony that he told her she "would" be tried as an adult. Johnson testified he told defendant she could be tried as an adult based on her age and the type of investigation they were conducting. No more was required. See *People v. Prude*, 66 Ill. 2d 470, 475-76, 363 N.E.2d 371 (1977); see also *People v. Brooks*, 241 Ill. App. 3d 84, 86, 608 N.E.2d 635 (1993), *rev'd on other grounds*, 158 Ill. 2d 260, 633 N.E.2d 692 (1994); *cf. People v. Jones*, 8 Ill. App. 3d 849, 852, 291 N.E.2d 305 (1972).

In sum, the evidence shows that defendant was questioned during the middle of the day in the absence of a concerned adult for 30 to 45 minutes. Detective Moser attempted to contact a youth officer as soon as defendant made a statement inconsistent with the detectives' information. Defendant was not brought into the police station under arrest and there is no showing or contention that she was under arrest during the brief period when she was questioned in the absence of a concerned adult. Defendant's mother was dead and she did not want the police to contact her father. Although defendant's grandmother was not permitted to see her, the detectives believed

she was too upset and might harm defendant. Even if the detectives' concerns regarding the emotional state of defendant's grandmother were unjustified, defendant was already meeting with a youth officer when her grandmother was at the police station. Moreover, ASA Johnson stated that defendant never asked to speak with her grandmother or any other family member. At the time of the questioning, defendant was four months shy of her sixteenth birthday. See *People v. Williams*, 275 Ill. App. 3d 249, 252, 655 N.E.2d 1071 (1995); *People v. R.B.*, 232 Ill. App. 3d 583, 594, 597 N.E.2d 879 (1992). The circuit court's determination that defendant's confession was voluntary was not contrary to the manifest weight of the evidence.

Accordingly, the order of the circuit court correctly denied defendant's motion to suppress her confession; and, as held in the accompanying Rule 23 order, defendant was not denied a fair trial by the court's exclusion of certain evidence or by the State's comments on cross-examination and during closing argument; however, as the State concedes, defendant was improperly sentenced. We, therefore, affirm defendant's conviction, reverse her sentence, and remand this case to the circuit court for resentencing.

Affirmed in part, reversed in part, and remanded.

HOFFMAN and SOUTH, JJ., concur.